## F. O. YOUNGER v. BARAK L. HOGE, OLIVER D. KESTER, MARCUS L. HEARD and A. R. MORGAN; A. R. MORGAN, Appellant.

**Division One, April 13, 1908.**

1. **MISREPRESENTATIONS: Of Existing Fact: Purchase of Corporate Stock: Rescission: Promise of Position.** A promise, though made without intention to fulfill it, is not a misrepresentation of an existing fact. A promise by stockholders of a corporation, about to sell their stock to plaintiff, that if he would purchase it he would be given the position of secretary and treasurer of the company, will not justify a rescission of his contract of purchase of the stock. Besides, if they did not own a majority of the stock, and so stated to him, the position was not theirs to give and he was not deceived thereby.

2. ――――: ――――: ――――: **Promise of Position: Evidence of Fraudulent Scheme.** An allegation in the petition that plaintiff was promised the position of secretary and treasurer of a corporation if he would purchase a part of the capital stock of the company, if relied upon, not as the basis of the action,

but as evidence of the fraudulent scheme, is not sustained, if the most that was told him by the sellers was that they could not give him the place without the consent of the other stockholders but would use their best endeavors to induce them to give him the position, which promise the evidence shows they kept.

3. **FALSE REPRESENSATIONS:** Purchase of Corporate Stock: Rescission of Contract. False representations to justify the cancellation of a contract must have been relied upon by the party complaining. So that where plaintiff testified that, in trading his farm for defendant's stock in a corporation, he relied to a great extent on the report of a commercial agency and was deceived thereby into believing that $83,000 of the one hundred and fifty thousand dollars of capital stock of the company was fully paid up, $57,000 in money and $26,000 in property at a fair value—the testimony showing that the information on which this report was based was furnished to the agency by the bookkeeper of the company under the direction of its president and was therefore in effect the representation of the defendants themselves—the contract of purchase cannot be rescinded if the testimony also shows that the books of the company showed exactly how the stock was paid, that plaintiff and his friend at his request examined the books before the trade was made, and plaintiff's witness who was the company's president testified as to the value and character of the property turned in to the company and that it was worth what it was turned in for, for by plaintiff's own statement he relied neither on the statements of defendants nor on the report of the commercial agency.

4. **FRAUD:** Relationship. Relationship is often an important fact to be considered with other facts and circumstances from which an inference of fraud is sought to be drawn, but alone it is not evidence of fraud, and sometimes it goes to negative an inference of fraud.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

Reversed and remanded (*with directions*).

*Rassieur, Schnurmacher & Rassieur* for appellant.

(1)  A representation, to authorize the rescission of a contract, must be shown: 1, to have been false, and known to be false, when made; 2, to have related to some past or existing fact; 3, to have been relied on

by the complainant; 4, to have been material; and, 5, to have been made with the intent to deceive. Hamlin v. Abell, 120 Mo. 188; Edwards v. Noel, 88 Mo. App. 434; 14 Am. and Eng. Ency. Law, 63. (2) A representation of a future event or a promise cannot be a misrepresentation which will vitiate a contract. Estes v. Desnoyers Shoe Co., 155 Mo. 577; Wade v. Ringo, 122 Mo. 326; Milliken v. Thorndyke, 103 Mass. 382; Atwood v. Chapman, 68 Me. 38. The promise, therefore, to make plaintiff an officer of the Cris-Po Purity Mills was not a misrepresentation in law, and may be disregarded in the consideration of this cause. (3) Fraud is an affirmative fact to be proven, not presumed; and while fraud may be deduced from circumstances, they must be such as to exclude any reasonable hypothesis of fair dealing; and if the circumstances are as consistent with honesty as with fraud, the transaction should be upheld. Hoeller v. Haffner, 155 Mo. 589. So, while fraud need not be established by direct and affirmative proof, circumstances frequently justifying such charge, yet the mere conjecture of fraud will not be sufficient to take the place of proof. Priest v. Way, 87 Mo. 16; Bank v. Kingsbury, 84 Mo. App. 82. (4) While relationship between the parties may be taken into consideration with other facts, yet it should be constantly borne in mind that this relationship makes it quite natural that one should aid and advise the other in any bona fide transaction. Christian v. Smith, 85 Mo. App. 177. (5) In dealing with matters of ordinary life, traders must look out for themselves, and a party may exalt the value of his own property to the highest point his antagonist's credulity will bear, without being guilty of deceit rendering him liable before the law. Cornwall v. McFarland R. E. Co., 150 Mo. 377; Anderson v. McPike, 86 Mo. 293; Black v. Epstein, 93 Mo. App. 459; Chase v. Rusk, 90 Mo. App. 25. (6) Courts do not undertake

to protect parties from their own folly and cupidity. Harrison v. Waldon, 89 Mo. App. 164. Even a court of equity will do nothing for a man who will not try to take care of himself; and it will not listen to one who complains of having been misled, if it appears that he has deliberately refused or grossly neglected to use his own senses. Cornwall v. McFarland R. E. Co., 150 Mo. 377; Jones v. Rush, 156 Mo. 364.

*Frank Y. Gladney* for respondent; *F. O. Posten* of counsel.

(1) Appellant's point 1 is undoubtedly a sound proposition of law. (2) The petition does not set out the promise to make respondent secretary and treasurer as a basis for actionable fraud, in itself. It is merely alleged to have been a part of the fraudulent scheme; a sham, make-weight inducement. Appellant's misinterpretation of this allegation is a pure gratuity. (3) Evidence of fraud is rarely of a direct and positive character. Very slight circumstances, when combined together, may afford irrefragable proof of fraud. Hopkins v. Sievert, 58 Mo. 201. Anything which satisfies the mind and conscience of its existence is sufficient. Massey v. Young, 73 Mo. 273; State ex rel. v. Standard Oil Co., 194 Mo. 155. (4) One who buys stock of a corporation is entitled to rely upon assurances of an officer as to its financial condition, and, even if a stockholder, is not bound to avail himself of his right of examining the books of the corporation. Wannell v. Kem, 57 Mo. 492; Bank v. Hunt, 76 Mo. 439; Cottrill v. Krum, 100 Mo. 397; Tinker v. Kier, 195 Mo. 200; Brolaski v. Carr, 105 S. W. 284. (5) Appellant Morgan does not occupy the attitude of an innocent purchaser for value without notice, and he cannot avail himself of that defense. His answer does not warrant such a contention. Halsa v. Halsa, 8 Mo. 308; Holdsworth v. Shannon, 113 Mo. 525; Ins. Co. v. Smith,

117 Mo. 293; Young v. Schofield, 132 Mo. 660; Stephenson v. Kilpatrick, 166 Mo. 268. And appellant cannot take advantage of the fact that respondent did not file a motion in the trial court to have the answer made more definite and certain. It is the primary duty of a party to make his claim or defense clear and unequivocal; this *onus* he cannot cast on his adversary. Huston v. Tyler, 140 Mo. 264; Leete v. Bank, 141 Mo. 581.

VALLIANT, P. J.—This is a suit in .equity, in which the plaintiff seeks to annul a transaction in which he conveyed to defendant Heard a 200-acre farm in Illinois, and to require the defendant Morgan, to whom Heard afterwards conveyed it, to re-convey it to the plaintiff. The petition charges that the defendants Kester and Heard made certain false representations to him by which he was deceived and thereby induced to make the deed conveying the land to Heard, and that defendant Morgan took the deed from Heard with knowledge of the fraud and to aid the fraudulent scheme. The transaction consisted in the conveying of the land to Heard for the consideration of stock in a manufacturing corporation in St. Louis. Defendants Kester, Heard and Hoge were at the time of this transaction, the chief stockholders in the corporation, they were directors and active participants in its business, defendant Morgan held five shares of the stock and about a month after the transaction in question was made secretary. The false representations alleged in the petition to have been made by Kester and Heard were that the capital stock of the corporation, $150,000, was all subscribed and $83,000 fully paid; that of the $83,000, $57,000 was paid in cash and $26,000 in property at a just and reasonable valuation; that the corporation was in a prosperous condition earning sufficient to pay all expenses and a large dividend on its total capital, and in addition to the representations it was

promised the plaintiff that if he would make the trade they would have him elected secretary and treasurer of the corporation at a salary of $100 a month; whereas, the petition averred, there was only $4,100.12 of the capital stock paid in cash and the remaining $145,899.88 was paid in property at a fabulous valuation. The petition alleges that Morgan was not an innocent purchaser, but that he had conspired with his co-defendants to defraud the plaintiff out of his farm.

Defendants Kester, Hoge and Morgan filed an answer to the petition which was a general denial and a plea that plaintiff did not rely on any representations made by them or Heard, but that he investigated the subject for himself and acted on his own judgment. They denied that Heard had ever made any such representations and averred that, if he did, he was not authorized by them to do so. Morgan especially denied that he had engaged in any collusion or conspiracy with his co-defendants to defraud the plaintiff and averred that he was an innocent purchaser of the property for value. There was no service of the summons on Heard and no appearance for him, the suit was, as to him dismissed.

At the trial the testimony in behalf of the plaintiff in reference to the alleged misrepresentations was chiefly that of the plaintiff himself and was to the following effect: Plaintiff is a merchant living in Murphysboro, Illinois. The corporation in question was a concern engaged in the manufacture of a breakfast food called Cris-Po. Plaintiff's attention was first attracted to this matter by an advertisement in a St. Louis newspaper; it led to a correspondence by mail and then to the plaintiff's coming to St. Louis and meeting defendants Kester and Hoge at the mills of the corporation. They went over the mills together. In the course of their conversation at that time Kes-

ter and Hoge said to plaintiff that they were very anxious to get an active business man to be secretary and treasurer of the concern, that they were more anxious to get a good man for that place than they were to sell the stock, that the man who then had the position, Heard, was sick and out of the city, but while they were talking Heard came in and was introduced to plaintiff and said he had unexpectedly returned. After talking the matter over at the mills no result was reached; they parted with an agreement to meet at a certain hotel that evening for further conference. At the meeting in the evening only Kester and Heard met the plaintiff and they had further discussion. Plaintiff made a proposition in writing which was not accepted and plaintiff returned to his home in Illinois. That proposition contained the condition that plaintiff was to be secretary and treasurer of the company, but Kester and Heard said they could not promise that without consulting Mr. Hoge and for that reason refused to accept it. "Q. You went home with the understanding that they would not promise you the position of secretary and treasurer without seeing Hoge? A. Yes, sir. In the meantime I think I telephoned Hoge to find out whether he was willing to make me secretary and treasurer and over the 'phone he gave his assent that he was." That was sometime in October, 1903. After returning home plaintiff obtained through a friend in St. Louis a report from the Dun Commercial Agency of the condition of the corporation and on the strength of that report he had a deed to the farm made out and signed and acknowledged by himself and wife and came with it to St. Louis. The substance of the Dun report was the authorized capital stock was $150,000 of which the amount paid in cash was $57,000 and paid otherwise $26,645.36; that the machinery and plant were worth $64,248.11; stock on hand, raw and finished, $6,441.30; bills receivable of

the value of $6,653.55; cash on hand and in bank,
$6,312.39; total liabilities, $900; assets over liabilities,
$82,745.36; refer to St. Louis Union Trust Company
and Live Stock Remedy Company. That report was
dated February 20, 1903, and there was evidence tend-
ing to show that it was made on information given the
Dun Company by the corporation book-keeper by di-
rection of the president. On arriving in St. Louis and
going to the factory plaintiff learned that there had
been a fire, the day before; therefore it was mutually
agreed that nothing could be done in furtherance of
their trade until the fire loss and insurance could be
adjusted. In fact Heard had telegraphed plaintiff not
to come because the fire had occurred, but plaintiff had
left home before the telegram was delivered. Plaintiff
then returned home. After some days Heard went to
the plaintiff's home to renew negotiations and told
him that the insurance had been adjusted and the busi-
ness had been resumed practically as it had be-
fore been. But plaintiff testified that he was not sat-
isfied to take Heard's word for it, but communicated
by telephone with Mr. Zeche, a friend of plaintiff's
in St. Louis, and requested him to go to the factory
and make an examination and report, which he did,
and on the strength of the report he offered Mr. Heard
the farm for $20,000 worth of stock, provided they
would make him secretary and treasurer at a salary of
$100 a month. Plaintiff had had some intimation that
Hoge had some claim on Heard's stock, therefore he
telephoned Hoge about it and Hoge replied that the
claim had been settled and that Heard's stock was
clear; thereupon Heard agreed to give plaintiff $20,000
in stock for the farm and to use his efforts to make
plaintiff secretary and treasurer at $100 a month. No-
vember 13th, 1903, plaintiff made the deed conveying
the farm to Heard and received $20,000 in stock, of
which $12,000 was Heard's stock and $8,000 belonged

to Kester. But it turned out that Heard and Kester did not own the majority of the stock, and they could not elect the plaintiff to the position he desired without the sanction of Hoge, and Hoge refused; this was on November 16th, three days after the deed had been delivered. · Hoge's reason for refusing was, as plaintiff testified, that it was the understanding that part of his stock was to be given for the farm and he was to have an interest in the trade. Then there was some unpleasant discussion between Kester, Heard and Hoge ("fuming and fussing," to quote plaintiff's words), in the course of which it was suggested that Kester should give Hoge $1,000, or that some property was to be transferred to him, and Hoge said to plaintiff that they were drawing up a paper for him (plaintiff) to sign agreeing that he would not try to recover the farm and if he would sign it they would make him secretary and treasurer. Just what the terms of this proposed paper were does not appear, but to quote the plaintiff's language: "Finally the thing collapsed right there, and the paper wasn't signed; nothing was signed." Plaintiff testified that they told him before making the trade "that while they were not making big money at the present time it was just getting into shape to make nice money; that they had a good plant." He testified that making him secretary and treasurer with the salary named was part of the consideration of the trade, and when he demanded of Kester after the trade that he fulfill that promise, Kester replied, "You see the position I am in, I can't do it by myself." He said he would do all he could to get Hoge in line. "Q. Was that before you made the trade or afterwards? A. That was afterwards. Q. What did he say before? A. He said he would help to make me secretary and treasurer of the concern; led me to believe he could do it. Q. Did you ascertain how much stock he had

—whether he could do it—he and Heard? A. I did not know how much stock they owned."

The deed conveyed the farm to Heard subject to two mortgages, one for $850, the other for $100.

In a letter from Kester to the plaintiff, dated October 1, 1903, the writer enclosed a "statement showing business in detail."

In a letter dated October 9, 1903, Kester said that the stock had "an actual market value of 75 cents, while there has been some little of the stock changed hands at a little above par. Should we arrange a satisfactory deal and you would care to become identified with the company, we can arrange you a nice salaried position." October 13th, he wrote again giving something of the history of the concern and its business prospects, and asking information about the farm, and concluded by saying: "I would want you to visit St. Louis and thoroughly familiarize yourself with the workings of the business here and everything of interest. We refer you for outside reference to Dun Merc. Agency or any banking house in the city." In the correspondence Kester gave the plaintiff to understand that the stock he was proposing to give for the farm was not his own but a friend's, which was true, it was Heard's stock. Before coming to St. Louis plaintiff got his friend Zeche to go to the mills of the corporation and examine its books, and Zeche's report corresponded with the statement sent in the letter of October 1st.

Defendant Hoge was called as a witness for plaintiff; his testimony was to the following effect: He was the president of the corporation. The capital stock was $150,000, 1500 shares of $100 each. Witness subscribed for 900 shares, Kester and Heard each 300. "From the books which are here, the opening statement or record was made that the stock was subscribed and paid up by property, $145,899.88, and cash $4,001.-

12. The entries are in Mr. Heard's handwriting. He was at the time an officer of the company. . . . The property that was put in consisted of an equipped mill, running, and a good bit of wheat and manufactured goods, cartons, special processes, appliances, etc.'' The valuation was made by witness, Kester and Heard, at what they considered was its value. The Dun statement was made by the bookkeeper under direction of witness; it was not made at the date of the organization and does not refer to that time. The corporation was the successor to a Michigan corporation called the Michigan Cereal Company, which was removed from that State to St. Louis and a new incorporation effected here, buying out the good will, plant, trade secrets, etc., of the Michigan company. Witness enumerated the principal items of property or assets and their valuation which were put into the concern here in payment of the stock, aggregating about $140,000. After the concern was in operation, witness, Heard and Kester put into it $14,000; they also turned into the treasury $67,000 of stock, about $30,000 of which was sold and the proceeds put into the business. Witness testified that he never saw the plaintiff but once before the trade was made and that was at the mills. He never told the plaintiff that the stock was full paid or that $83,000 was paid in money and machinery. Never promised plaintiff to give him the position of secretary or treasurer, never heard of such demand until after the trade had been made, or that such representations had been made. Witness bought the farm from Heard, and at Heard's request paid the consideration to Kester, $650 cash and $6,000 in stock in the company. Kester was a brother-in-law of witness and so also was Morgan. Witness sold the farm to Morgan for $3,000, and requested Heard to make the deed to him which was done.

In December following the trade, plaintiff had an

expert bookkeeper to examine the books of the concern and he testified that from the books he examined, which were the journal, cash book and ledger, it appeared that from the middle of May, 1902, to the last of August, 1903, there appeared a loss of $9,000; but he said he took no account of the stock in trade or the goods on hand, raw or manufactured, and he did not mean to say that there was an actual loss.

On the part of defendants the testimony was that neither of them ever stated to the plaintiff that $83,000 of the stock had been fully paid, or that the concern was at the time earning money enough to pay expenses and a dividend on the stock, and they never agreed to give him the position of secretary and treasurer; that at the meeting at the hotel referred to, the plaintiff made a written proposition to convey the farm for $18,000 of stock and the position of secretary and treasurer at the salary of $100 a month, which they refused, because they told him the position was not in their power to give. After the plaintiff went home and returned again to St. Louis he offered to deed the farm for $20,000 of stock, the offer was accepted and the trade closed.

There was no evidence that plaintiff offered to return the stock and rescind the trade before this suit was brought; at the trial plaintiff tendered the stock. The trial court found the issues in favor of the plaintiff and rendered a decree requiring defendant Morgan to reconvey the farm to plaintiff; from that judgment defendant Morgan has appealed.

I.  One reading the plaintiff's testimony is impressed with the idea that his main grievance is that he was not given the position of secretary and treasurer at a salary of $100 a month. Assuming that the evidence proved that such promise was made, it would not justify a rescission of the contract on the theory of misrepresentation. A promise, though made with-

out intention to fulfill, is not a misrepresentation of an existing fact. [Wade v. Ringo, 122 Mo. 322; Estes v. Desnoyers Shoe Co., 155 Mo. 577.] The learned counsel for respondent in their brief say that the petition does not set out the promise as a basis for the alleged actionable fraud, but only as evidence of a fraudulent scheme. Considering it even in that light it can avail the plaintiff nothing, because his evidence does not sustain it. True in one of his letters Kester said, "Should we arrange a satisfactory deal and you would care to become identified with the company, we can arrange you a nice salaried office." What office and at what salary is not mentioned. Besides, that was before the negotiations in personal interviews had taken place. In those interviews, as the plaintiff's own evidence shows, the defendants refused to make the promise or bind themselves to it, because, as they told the plaintiff, they did not own a majority of the stock and could not give him the place without Hoge agreed to it. Plaintiff in his testimony did not claim that Kester or Heard promised anything more than that they would use their best endeavors to secure the place for him; he said, "They told me they could not promise it without consulting Mr. Hoge," and so far as the evidence goes it tends to show that they did try to get the place for him, but Hoge would not agree; there is nothing to the contrary. The evidence shows that the position of secretary and treasurer had been held by Heard, at what salary was not shown, but that on account of ill health he could not attend to it, and that in December, after the trade, defendant Morgan, who owned five shares of the stock, was elected secretary and treasurer at $50 a month and was holding the place in January, 1904, when plaintiff came to St. Louis and again urged that the place be given to him and on being refused brought this suit.

II. On the question of false representations the

most that can be said for the plaintiff's side is that
there was some evidence tending to prove the charge,
but it was entirely overcome by the preponderance of
the evidence contra. Even the plaintiff's own testi-
mony fell far short of the allegations in his petition.
In the petition he said that defendants represented
to him that the corporation was in a "prosperous con-
dition and its earnings were sufficient to pay all ex-
penses and in addition to pay large dividends on its
total capital;" in his testimony he said they told him
"that while they were not making big money at the
present time, it was just getting in shape to make nice
money; that they had a good plant." That statement
relates rather to prospects than to past or present
success. But even to that extent the weight of the
testimony is to the contrary.

Plaintiff testified that he relied to a great extent
on the Dun report and by that was deceived into be-
lieving that $83,000 of the stock was fully paid in mon-
ey and money's worth, that of that sum $57,000 was in
money and $26,000 in property at a fair value, and the
testimony showing that the information on which that
report was made was furnished by the bookkeeper un-
der the direction of the president, it was in effect the
representation of the defendants themselves. But the
testimony shows that the books of the concern showed
exactly how the stock was paid, and it shows that the
plaintiff and his friend Zeche examined the books be-
fore making the trade and he is chargeable with knowl-
edge of their contents. Besides, the plaintiff's witness
Hoge testified to the character and value of the prop-
erty and assets turned in to the company in payment of
the stock and according to that testimony it was worth
what it was turned in for. True, Hoge was one of the
defendants and although a witness for plaintiff he may
be considered unfriendly to plaintiff's cause in so far
as his feeling is liable to influence his judgment as to

values, but that fact is not to be considered as affecting his veracity. There was no other evidence offered on that point.

False representations to justify the cancellation of a contract must have been relied on by the party complaining. Plaintiff himself testified that he did not rely on the statements that the defendants made to him, but that he and his friend Mr. Zeche examined the mills and examined the books and on that and the Dun report he made the trade.

It is significant that the plaintiff offered no proof as to the value of his farm or the value of the stock. He claims in his petition that he made the trade, being misled by defendants' false representations into believing that the stock was fully paid in money or money's worth and the business was then earning enough to pay all expenses and large dividends on the total capital. The total capital was $150,000. If it is true that the plaintiff so believed then he must have believed that the stock was worth at least par and that he was getting stock worth fully $20,000 for his farm; that would be $100 an acre. But the only evidence in the record as to the value of the farm was that of defendant Morgan who said it was worth $20 to $25 an acre, which would amount to $4,000 or $5,000, less the two mortgages, $950. From those figures we must conclude either that the plaintiff knew he was trading his farm for stock far below its face value or else that he was getting four or five times as much as it was worth. The evidence does not sustain the plaintiff's charge of fraud.

III. Since the plaintiff's charge of fraud and conspiracy is unsupported by the evidence there is really no necessity for going further to discuss the connection of defendant Morgan with the alleged fraudulent acts, but since he has been charged with fraud we will look at the evidence as it relates to him. He was not

connected with the management of the affairs of the corporation at the time of the transaction complained of, although he then owned five shares of stock, but in December following he became the secretary and treasurer at a salary of $50 a month. We infer that the duties of the office were not very exacting, since the salary was small, and also because the evidence shows that he was at the time holding another position which would occupy nearly all his time. The only facts pointed to by the plaintiff as connecting Morgan with the trade that was made between the plaintiff and Heard are that he is a brother-in-law of Hoge's and that he bought the farm from Hoge three days after Hoge had bought it from Heard, and that he had bought it without making a personal examination. He testified that he bought it on representations of Mr. Hoge and from his own knowledge of the value of land in that vicinity, he having been raised near there; he paid Hoge $3,000 for it; he knew nothing of the transaction between the plaintiff and Kester and Heard. There was no evidence to the contrary. Relationship is often an important fact to be considered with other facts and circumstances from which an inference of fraud is sought to be drawn, but alone it is no evidence of fraud, and sometimes it even goes to negative an inference of fraud, as in this case, for example; the relationship bringing the two men into intimate association may result in confidence and may serve to explain why Morgan would buy the farm without a personal inspection as he would probably have made in buying from a stranger. Hoge and Morgan both testified that it was a sale in good faith and there is no evidence to the contrary.

The judgment is reversed and the cause remanded with directions to the circuit court to enter judgment for defendants, dismissing plaintiff's bill.

All concur.