GRAND LODGE OF UNITED BROTHERS OF FRIENDSHIP AND SISTERS OF MYSTERIOUS TEN v. MASSACHUSETTS BONDING AND INSURANCE COMPANY and JAMES H. WILLIAMS, Appellants.—25 S. W. (2d) 783.

Court en Banc, March 4, 1930.

940

*Harding, Murphy & Tucker* and *Leahy, Saunders & Walther* for appellant.

*Irwin & Bushman* and *C. H. Calloway* for respondent.

FRANK, J.—The plaintiff is a fraternal beneficiary society incorporated under Article 11, Chapter 90, Revised Statutes 1919, and conducting an insurance business among the negroes in this State and part of Iowa. There were about 1700 members at the time here involved. The defendant Williams was grand treasurer of the organization between September, 1919, and October, 1922. A fidelity bond written by the defendant Bonding Company protected the Grand Lodge against pecuniary losses of money, securities or other personal property sustained through the acts of larceny or embezzlement on the part of Grand Treasurer Williams, up to $20,000. In the fall of 1922 a shortage in his account was discovered, exceeding $18,000.

The Grand Lodge brought this suit on the bond. The case was referred by consent of the parties to Hon. D. W. Peters, attorney at law of Cole County. He reported his conclusions of fact and law, finding for the plaintiff against the defendant bonding company in the full penal sum of the bond, $20,000, which covered the shortage aforesaid with some $3,000 interest thereon. He also recommended a penalty for vexatious delay in the sum of $2,000 and a $2,500 fee for plaintiff's attorneys. The Cole County Circuit Court overruled the lengthy exceptions of the Bonding Company, confirmed the report of the referee, and rendered judgment in accordance therewith for $24,500 and costs. This appeal followed.

Appellant contends that the lodge made certain promissory warranties in the application for the bond which it thereafter breached, and that the breach of such promissory warranties precludes a recovery on the bond.

The bond itself is the contract between the parties and is the only evidence of the duties, obligations and promises to be performed by each party during the life of the bond, and is the only instrument to which we can look in determining what warranties, if any, were made by the lodge. Since warranties are a part of the contract they must appear on the face of the bond, either by being copied therein, or if on a collateral document they must be referred to in the bond with sufficient clearness to indicate that it was the intention of the parties to make them a part of the bond. [14 R. C. L. 1026, sec. 206.]

The written application pursuant to which the bond was issued contained a statement made by the employer which is styled "Employer's Statement." The alleged warranties which the Bonding Company claims where breached are not set out in the bond but are contained in the Employer's Statement. Under the well settled rule above pointed out, the alleged warranties appearing in the application for the bond, but not in the bond, are not a part of the bond unless the bond refers to the application, or to statements made

therein with sufficient definiteness to make the matter referred to a part of the bond. The bond does not refer to the Employer's Statement in its entirety and make it a part of the bond. On examination of the bond we find it contains the following reference:

"All representations made by the employer to the surety *relative to the employee* in connection with the issuance of this bond or any continuation thereof are warranted to be true." (Italics ours.)

Under this reference all statements made by the employer *which relate to the employee* are warranted to be true, but statements made *which do not relate to the employee* are not warranted to be true.

The Employer's Statement consists of twenty-four questions and answers, at least twenty of which are relative to the employee. These questions inquire in detail as to what the employee's duties will be, how much money he will handle and from what sources he will receive it, whether or not he will give any security other than the bond applied for, whether or not he has been heretofore in the employ of the lodge, and if so was his personal conduct satisfactory, and did he faithfully perform his duties and keep and render his accounts properly and without default, whether or not he was ever in arrears or indebted to any employer, how he would be required to keep and dispose of money coming into his hands, etc. It is clear that the answers to such inquiries relate to the employee and for that reason are warranted by the bond to be true, but as it is not claimed that these answers were false, it is not necessary to give them any further notice.

The answers made by the employer which the Bonding Company contends were warranted as true, but thereafter breached, are as follows:

"Q. Will he be authorized to sign checks for the organization? A. Yes.

"Q. If so, will they be invariably countersigned by another officer after they are drawn? A. Grand Master.

"Q. How often will the applicant's books and accounts be audited and verified with funds and securities on hand and in the bank? A. Once a year by the Commissioner of Ins. & Grand Lodge."

All parties understood that the employee was authorized to sign checks for the lodge and no complaint is made on that score. The answers to the other questions are statements by the lodge that its Grand Master will countersign all checks and that the Grand Lodge will, once each year, audit the treasurer's books and accounts and verify them with funds and securities on hand and in the bank. These statements are not relative to the employee, nor do they relate to the character or conduct of the employee, either past or present, or to the duties he will be required to perform or the manner in which he should perform them. They relate solely to what the

Grand Master and the Grand Lodge represented they would do in event the bond was given. In other words, the statements relate to the future conduct of the *employer* and not to that of the *employee*. and for that reason they are not incorporated in the bond by reference because the bond refers only to statements made by the employer to the surety *relative to the employee.*

Before the bond was delivered the Bonding Company and the lodge, entered into the following joint-control agreement:

"Now therefore it is hereby agreed and warranted that all securities the property of said first party coming into the hands and possession of said James H. Williams, as Grand Treasurer, shall be deposited in safe-deposit vaults of the Traders' National Bank of Kansas City, Missouri, and the box containing said securities shall be opened by said J. H. Williams only while in the presence of said Gideon W. Brown, it being the intent and agreement of this instrument that said securities shall be under the joint control and care of said James H. Williams and said Gideon W. Brown."

Appellant contends that the joint-control agreement is a part of the bond and the breach of the promissory warranties contained therein precludes a recovery on the bond.

This agreement does not appear in the bond and cannot be considered a part thereof unless the bond refers to it in terms sufficiently definite to indicate that it was the intention of the parties to make it a part of the bond. When we keep in mind that the only reference in the bond relates to representations made by the employer *relative to the employee,* it logically follows that the statements and representations contained in the joint-control agreement are not made a part of the bond by this reference unless they *relate to the employee.* In determining this question the joint-control agreement should be interpreted in the light of the terms expressed in the bond and in view of the purposes for which the bond was given. The bond provides in express terms that the Bonding Company will reimburse the lodge for all losses of money, securities, etc., occasioned by acts of larceny or embezzlement on the part of the employee. The joint-control agreement executed by the lodge on the one side and by the Bonding Company on the other, recites that all securities, the property of the lodge, coming into the hands of the treasurer shall be deposited in safe-deposit vaults in the bank and not thereafter withdrawn except in the presence of the Grand Master. If the treasurer, after receiving securities belonging to the lodge, should fail to deposit them in the bank but appropriate them to his own use, under the express terms of the bond the Bonding Company would be liable for such loss, but under the literal wording of the joint-control agreement the Bonding Company would not

be liable because the treasurer's failure to deposit the securities in the bank would be a breach of the warranties contained in the joint-control agreement. In other words, the provisions of the joint-control agreement, if interpreted literally, are inconsistent with the provisions of the bond. What purpose could the lodge have in paying a premium on the bond to protect itself against the dishonesty of its employee if at the same time it guaranteed the Bonding Company that all securities coming into its employee's hands would be deposited in safe-deposit vaults in the bank and not withdrawn except in the presence of the Grand Master of the lodge? The evident purpose of the bond being to protect the lodge against the dishonesty of its employee, the joint-control agreement should not be given a meaning inconsistent with the purpose of the bond, if it is susceptible of any other construction.

The bond provides that the Bonding Company will reimburse the lodge for all losses sustained on account of acts of larceny or embezzlement of securities by the employee. If it should be held that by the terms of the joint-control agreement the lodge agreed and warranted that all securities coming into the hands of the employee should be deposited in the bank under joint control, such holding would not aid appellant because the provisions of the joint-control agreement would then be inconsistent with the provisions of the bond, and in that situation it would be the duty of the court to adopt the construction most favorable to the insured. However, if the joint-control agreement were a part of the bond, the reasonable construction of the entire instrument would then be that by the terms of the joint-control agreement the lodge agreed to make it the duty of the employee to deposit all securities coming into his hands in the bank, and the bond guaranteed the lodge against losses occasioned by the non-performance of that duty by the employee. Any other construction would force the lodge to guarantee its own losses resulting from larceny or embezzlement of securities by the employee before the securities reached the bank.

It is true that a warranty on the part of the lodge that all securities which were actually deposited in the bank should be held under joint control and not withdrawn without its consent, would not be inconsistent with the provisions of the bond, and a breach of such a warranty, if made, would preclude a recovery on the bond. But the question in this case is whether or not the lodge made such a warranty. Where, as here, the alleged warranties are not set forth in the bond but appear in a collateral document, they must be referred to in the bond as clearly to indicate that the parties intended to make them a part of the bond. [14 R. C. L. 1026, sec. 206.]

948

We have already pointed out that the only reference in the bond is the representations made by the employer to the surety *relative to the employee*. So the question is whether or not the alleged warranties appearing in the joint control agreement are *relative to the employee*.

The agreement does not mean that the lodge agreed and warranted that the integrity of the employee was such that he would not open the box containing the securities except in the presence of the Grand Master. If it did, the lodge would be guaranteeing his honesty. Reasonably interpreted, the agreement means that the lodge agreed that it, as a lodge, would so arrange matters with the bank that the bank would not permit the employee to open the box except in the presence of the Grand Master. So interpreted the agreement relates to what the lodge agreed to do in event the bond was given. In other words, *it is relative* to the future conduct of the *employer* and not to that of the *employee*, and for that reason it is not made a part of the bond and is not a warranty.

The bond is the agreement between the parties, and any statement or alleged agreement which is not made a part of the bond is no part of the contract. It is true that by the terms of the joint-control agreement and the employer's statement, the lodge represented that in event the bond was given, its Grand Master would countersign all checks drawn by the employee: that it would make an annual audit of the employer's books and verify them with funds and securities on hand and in the bank, and that all securities coming into the hands of the employee would be deposited in safe-deposit vaults in the bank and there held under joint control, but as we have heretofore pointed out, none of these representations was made a part of the bond, and for that reason non-compliance with them, on the part of the lodge, would not be a breach of the bond.

Appellant, however, makes the further contention that if the statements in question be regarded as promissory representations only, the failure of the respondent to even substantially comply with them, they being material as a matter of law, discharged appellant from liability on the bond.

There is a distinction between a representation and a warranty. A representation is not, strictly speaking, a part of the contract, or the essence of it, but rather something collateral or preliminary, and in the nature of an inducement to it, while a warranty enters into and forms a part of the contract itself. [Life & Accident Insurance, 1 Bacon (4 Ed.) 464, 466, secs. 255, 256.]

The statements made by the lodge relative to the countersigning of checks, the annual audit and verification of employee's books, and the joint control of securities belonging to the lodge, not being a

part of the bond, must be regarded as promissory representations only. The rule in this State is that representations, in order to avoid a contract or bond, must have been fraudulently made. Intentional fraud is essential to an action or defense of deceit or misrepresentations. [Summers v. Metropolitan Life Ins. Co., 90 Mo. App. 691, 700; Commercial Bank v. Bonding Co., 194 Mo. App. 224, 232, 233, 187 S. W. 99; Life Insurance Co. v. Glaser, 245 Mo. 377, 389, 150 S. W. 549; 14 R. C. L. p. 1082, sec. 260; Life & Accident Insurance 1 Bacon (4 Ed.) 460, sec. 258.]

Another well settled rule is that false representations, in order to constitute actionable fraud, must relate to past or existing facts. Representations, although false, which relate to something to be done in the future cannot be made the basis of a charge of fraud. In Bryan v. L. & N. Railroad, 292 Mo. 535, 545, the rule is thus stated:

"The implied representation might have amounted to a promise of defendant as to indefinite future action, but not as to any fact then existing. This being true, under the adjudicated cases in this State defendants' conduct is not actionable. Thus in Younger v. Hoge, 211 Mo. 444, the rule has been laid down, l. c. 455, 456, that 'a promise, though made without intention to fulfill, is not a misrepresentation of an existing fact.' Following this case, the St. Louis Court of Appeals in Missouri Loan & Inv. Co. v. Federal Trust Co., 175 Mo. App. 646, l. c. 651, 652, has thus stated the rule: 'A representation to amount to fraud must assert a fact or facts as existing and cannot relate to the future. If it does, it is not fraud, whatever may be the intention of the party or the effect of his statement.' As announced in 12 R. C. L. sec. 14, p. 244, the principle is expressed, thus: 'As a general rule, in order to constitute actionable fraud, a false representation must relate to a matter of fact, and such fact must be one which exists in the present or which has existed in the past.' "

Again in Metropolitan Paving Co. v. Brown-Crummer Inv. Co., 309 Mo. 638, 274 S. W. 813, 823, this court said:

"It is contended that the alleged fraudulent representations in this case were mere promises and not misrepresentations of existing facts, and for that reason plaintiff has no cause of action. It is true that a promise to do a certain thing, with a present intention not to do it, is not actionable. [Younger v. Hoge et al., 211 Mo. 444, 111 S. W. 20, 18 L. R. A. (N. S.) 94; Shoup v. Tanner-Buick Co., 211 Mo. App. 480, 245 S. W. 1. c. 366; Bryan v. Railroad, 292 Mo. l. c. 544, 238 S. W. 484, 23 A. L. R. 537; Cerny v. Paxton, 78 Neb. 134, 110 N. W. 882, 10 L. R. A. (N. S.) 640 and notes.]"

In the instant case the lodge represented that in event the bond was given, its Grand Master would, during the life of the bond, countersign all checks drawn by the employee; that it would an-

nually audit and verify the employers books, and that all securities coming into the hands of the employee would be deposited in safe deposit vaults under joint control. These representations do not relate to either past or existing facts. On the contrary, they relate to what the lodge promised to do in the future in event the bond was given. A promise to do something in the future cannot be made the basis of either a charge or defense of fraud. [Bryan v. L. & N. Railroad and Metropolitan Paving Co. v. Brown-Crummer Inv. Co., supra.] For the reasons stated, the representations and promises made by the lodge cannot be regarded as fraudulent representations inducing the making of the bond.

By the terms of the bond all losses not exceeding $20,000, which  the lodge sustained during the life of the bond and discovered within six months after the expiration or cancellation thereof, were covered by the bond. The bond, as originally executed, covered a period from the 15th day of September, 1919, to the 15th day of September, 1920. It contained the following provision concerning its extension:

"The term of this bond may be extended only by continuation certificate or certificates duly executed by the surety."

The bond was continued in force for the period beginning on September 15, 1920, and ending on September 15, 1921, by a continuation certificate executed by the surety. It was again continued by a like certificate executed by the surety to cover the period beginning on September 15, 1921, and ending on September 15, 1922.

Appellant contends that each renewal or extension of the bond was a separate and independent contract and for that reason losses occurring during the life of the original bond and the first continuation or extension thereof are not recoverable because not discovered within six months after the expiration of the bond covering the loss.

By the terms of the bond, losses not discovered within six months after the expiration of the bond cannot be recovered. If in fact there were three separate bonds, it would have been necessary for the lodge, in order to recover losses sustained, to have shown when the losses occurred, for the purpose of determining which bond covered the losses, and whether or not such losses were discovered within six months after the expiration of the particular bond covering such losses. On the other hand, if the original bond and the two continuations or extensions were intended by the parties to constitute one continuous contract, limiting the liability of the surety to $20,000, the amount named in the original bond, then the bond and the two continuations would, in effect, constitute one bond covering a period of three years, and all losses occurring at any time during the three years and discovered within six months after the ex-

piration of such three-year period would be covered by the bond and the surety would be liable therefor.

We recognize that it is generally held that a renewal of a bond or policy constitutes a separate and distinct contract· for the period of time covered by the renewal. [Eicks v. Fidelity & Casualty Co., 300 Mo. 279, 291, 253 S. W. 1029.] However, this general rule has no application to a case where the provisions of the extension certificate show that the purpose and intention of the parties was not to make a new contract, but to continue the original contract in force and effect.

The rule in this regard is thus stated in 25 Corpus Juris, 1109, Section 16:

"The rule generally recognized is that a renewal of a policy or bond constitutes a separate and distinct contract, for the period of time covered by the renewal, unless it appears to be the intention of the parties, as evidenced by the provisions thereof, that such policy or bond and the renewal thereof shall constitute one continuous contract."

In other words, insurance is a matter of contract between the parties, and the provisions of the contract measure the rights and duties of the parties thereunder. Now, what are the facts in this case regarding the extension or continuation of the original bond? The original bond was executed by the surety in the sum of $20,000 to cover a period beginning on September 15, 1919, and ending on September 15, 1920. Shortly before the bond expired, the surety executed the following continuation certificate:

"In consideration of the sum of Fifty and 00/100 Dollars Massachusetts Bonding and Insurance Company hereby continues in force Bond number F-86280 in the sum of twenty thousand dollars ($20,000) on behalf of James H. Williams in favor of Grand Lodge of the United Brothers of Friendship and Sisters of the Mysterious Ten for the period beginning on the 15th day of September, 1920, and ending on the 15th day of September, 1921, subject to all the covenants and conditions of said original bond heretofore issued on the 15th day of September, 1919.

"Provided the aggregate liability of Massachusetts Bonding and Insurance Company from the date of the issuance of said bond to the date of the expiration of this certificate shall not exceed the sum written above."

At the end of the first continuation, the bond was again continued or extended for another year by another continuation certificate, an exact counterpart of the first except as to dates.

These continuation certificates, among other things, say: "In consideration of the sum of Fifty and 00/100 Dollars Massachusetts Bonding and Insurance Company hereby *continues in force* Bond

Number F-86280 in the sum of Twenty Thousand Dollars ($20,000)."
(Italics ours.) Webster defines the word "continue" to mean, "to protract or extend in duration; to cease not; to carry onward or extend." The words "continue in force" as used in the continuation certificate clearly indicate that it was the intention of the parties to extend the duration or term of the original bond and not to make a new contract. Another clause in the continuation certificates strengthens this conclusion. The total liability of the Bonding Company during the entire three-year period covered by the original bond and the two continuances is limited to $20,000, the amount named in the original bond. Note the language of the continuation certificates:

"Provided the aggregate liability of Massachusetts Bonding and Insurance Company from the date of the issuance of said bond to the date of the expiration of this certificate shall not exceed the sum written above."

The original bond was written in the sum of $20,000. The two continuations were each in the sum of $20,000. If, as appellant contends, there were three separate bonds, the total liability of the Bonding Company would be $60,000. The fact that the original bond was executed in the sum of $20,000 and the further fact that the two continuation certificates limit the total liability of the Bonding Company for the entire period covered by the original bond and the two continuances to $20,000, leads to the conclusion that the two continuances were not new bonds, but were in fact extensions of the term of the original bond. We therefore hold that the original bond and the two continuances thereof, were, in fact, but one bond in the sum of $20,000 covering a period of three years. This being true losses occurring at any time during the three-year period and discovered within six months after the expiration of said three-year period were within the terms of the bond and appellant is liable therefor. The evidence showed that the losses were discovered within six months after the expiration of the three-year period covered by the bond.

Prior to the execution of the continuation certificates, the lodge made a written statement to the surety that "the books and accounts of James H. Williams in our employ were examined by *us* and *we* found them to be correct in every respect, and all moneys handled by him accounted for." Appellant contends that this statement was made a part of the bond and warranted to be true; that it was false and for that reason it is not liable to the lodge for any shortage occurring during either continuation of the bond.

This statement, if it be a warranty, was not an absolute warranty that the employee's books were correct, but merely that the *lodge*

had examined them and *found* them correct. The statement does not say that the books were examined by an expert accountant or that they were correct. It merely states that the *lodge* examined them and *found* them correct and the money accounted for. If the lodge examined the books and in so doing made an honest effort to discover their condition and found no shortage, the statement made to the surety in relation thereto was true, although a shortage existed at the time the examination was made. [25 C. J. 1107; Police Relief Association v. American Bonding Company, 197 Mo. App. 430, 446, 196 S. W. 1148.] The burden was on defendant to plead and prove that the statement was false. The referee found that once each year during the life of the bond a committee appointed by the Grand Lodge examined the treasurer's books and found no shortage. The evidence supports the finding.

Contention is made that the court erred in not setting aside the report of the referee, because of the referee's erroneous conclusion of law to the effect that the burden was upon the defendants to show that the shortage in the treasurer's accounts was due to irregularities other than the acts of larceny or embezzlement. The referee's report contains the following:

"The defendant surety company having admitted the execution of the bond sued upon, and the examinations made by the various auditors of the Grand Treasurer's accounts having shown conclusively the existence of a shortage, the burden was upon the defendants to show that said shortage was due to irregularities other than acts of larceny or embezzlement; this they completely failed to do."

The bond guaranteed to reimburse the lodge for all losses occasioned by acts of larceny or embezzlement of its employee. The burden was on the plaintiff not only to show its loss but to show that such loss was due to acts of larceny or embezzlement. The referee's conclusion of law that the burden was on defendants to show that the shortage was not due to acts of larceny or embezzlement, was erroneous and would cause a reversal of this case if it appeared that the referee based his findings on the mere fact that a shortage was shown and that defendants failed to show what caused the shortage, but the record does not so show.

The referee not only found that the treasurer by acts of larceny and embezzlement appropriated more than $18,000 to his own use, but states the facts upon which that finding is based. His report states that one accountant from the Insurance Department of the State, and another employed by plaintiff, examined the books and accounts of the treasurer, and found a shortage in excess of $18,000.

It is also stated by the referee that one Frazier, who audited the treasurer's books for defendant, found only approximately $11,000 shortage, but that it was later discovered that in this audit the treasurer was credited with the payment of claims in excess of $8,000, which had been allowed, and orders regularly issued therefor, but which subsequent investigation disclosed had not been paid by the treasurer. This statement of the referee is supported by the evidence.

The evidence tends to show that one hundred and thirteen claims which were allowed and orders or warrants drawn on the treasurer therefor, were not paid by the treasurer, but were afterward paid by the lodge on duplicate warrants. Twenty-one of these claims were entered on the treasurer's cash-disbursement book as having been paid by him, when in fact, they had not been paid. The act of the treasurer in taking credit on his books for the payment of claims which he had not paid, was a badge of fraud which tainted the whole transaction and justified the trier of fact in finding that he had appropriated the money to his own use and was making false entries in his books for the purpose of concealing his shortage. [State v. Pate, 268 Mo. 1. c. 442, 443.] Technical proof of fraudulent acts as required in a criminal prosecution for embezzlement or larceny is not necessary. [Delaware State Bank v. Colton, 102 Kan. 367, 170 Pac. 992; Vilm Milling Co. v. Kansas Casualty & Surety Co., 180 Pac. 782.] In Green v. Fidelity & Guaranty Co., 135 Tenn. 117, 123, it is said "that the words 'larceny and embezzlement' in the bond are used as generic terms to indicate the dishonesty and fraudulent breach of any duty or obligation upon the part of the officer in connection with his duties as president."

The referee's report recites that he "finds the amount of the larceny and embezzlement of the defendant J. H. Williams, while Grand Treasurer of plaintiff, and for which the defendant surety company is liable to be $18,207.08." He concludes his finding of facts by saying:

"Having found that J. H. Williams, Grand Treasurer of plaintiff, did, during his term of office, by acts of larceny and embezzlement, appropriate to his own use the sum of $18,072.08, the next question to be determined is whether or not the surety company is liable under its bond issued as aforesaid for such shortage."

The fact that the referee found that the treasurer *embezzled and appropriated to his own use funds belonging to the lodge*, shows that the referee's finding that plaintiff was entitled to recover on the bond, was not prompted by the erroneous conclusion of law that the bare existence of a shortage, unexplained by defendants, entitled plaintiff to recover, but was based on the fraudulent acts of the treasurer in converting to his own use the funds in question. This

being an action at law, the referee's finding of facts has the force of a special verdict, and as it is supported by substantial evidence, it is conclusive as to the facts. In actions at law, either the trial or appellate court may set aside the referee's conclusions of law, if erroneous, and properly apply the law to the facts found. [Steffen v. City of St. Louis, 135 Mo. 44, 49, 36 S. W. 31.]

For the reasons stated appellant's contention that the referee's report should have been set aside because of his erroneous conclusion of law is disallowed.

The next and last contention is that there was no evidence justifying the referee's finding of a vexatious refusal to pay and the assessment of penalties and attorney fees.

The rule which should govern in determining whether or not a refusal to pay is vexatious, is well stated in Patterson v. Insurance Co., 174 Mo. App. l. c. 44, 160 S. W. 59, as follows:

"And while affirmative proof is not required to show vexatious refusal, yet the penalty should not be inflicted unless the evidence and circumstances show that such refusal was willful and without reasonable cause as the facts appeared to a reasonable and prudent man before the trial; and merely because the judgment, after trial, is adverse to defendant's contention, is no reason for inflicting the penalty."

We have already stated and discussed the facts upon which defendant Bonding Company relied as a justification for its refusal to pay. While those facts are not sufficient to defeat a recovery on the bond, we do not think they warranted a finding that defendant's refusal to pay was vexatious.

The amount of the penalty and attorneys' fees assessed was $4500. We think the judgment is excessive to that extent, and if within ten days from the entry hereof, respondent will enter a *remittitur* in the sum of $4500 as of the date of the judgment, the judgment of the trial court will stand affirmed for $20,000 as of the date of the original judgment, otherwise the judgment is reversed and the cause remanded for a new trial.

All concur.