MASSACHUSETTS BONDING AND IN-SURANCE COMPANY, a Corporation, Appellant,

v.

JULIUS SEIDEL LUMBER CO., a Corporation, Appellee.

No. 16352.

United States Court of Appeals
Eighth Circuit.

July 1, 1960.

Herbert E Barnard, St. Louis, Mo., for appellant.

Robert F. Schlafly, St. Louis, Mo., for appellee.

Before SANBORN, WOODROUGH and BLACKMUN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal by the defendant (appellant), hereafter referred to as "surety", from a judgment for the plaintiff (appellee) in the principal sum of $11,600 in a diversity action upon a contract or contracts of suretyship or fidelity insurance by which the surety agreed to pay to the plaintiff such loss as it might sustain by acts of dishonesty of a cashier and bookkeeper employed by it.

■ The contract in suit is a Missouri contract, and the applicable substantive law is that of Missouri. The facts are stipulated. The case was tried to the court. The judgment represents the considered views of a Missouri federal judge as to what the Supreme Court of that state would probably hold in a case presenting the same facts. The burden of demonstrating that the District Court misconstrued or misapplied the applicable law is that of the surety. Western Casualty & Surety Co. v. Coleman, 8 Cir., 186 F.2d 40, 43; Globe Indemnity Co. v. Wolcott & Lincoln, Inc., 8 Cir., 152 F.2d 545, 547.

The plaintiff's claim, as stated in its complaint, is, in substance, as follows: That on June 29, 1940, the surety entered into a fidelity insurance contract insuring plaintiff against losses from the dishonesty of L. A. Feldmeier, its bookkeeper and cashier, for the year July 15, 1940, to July 15, 1941, to the extent of $1,800; that in subsequent years plaintiff and the surety entered into insurance contracts insuring the plaintiff against such losses to the extent of $1,800 per year, for one-year periods commencing on July 15 in each of the years 1941 to 1950, inclusive, and to the extent of $2,000 per year for yearly periods commencing July 15 in 1951, 1952, 1953 and 1954; that in December, 1954, plaintiff discovered that Feldmeier had embezzled funds from it commencing

in 1949; that the surety was promptly notified; that the plaintiff duly submitted proofs of loss showing unrecovered losses in excess of $2,000 in each of the four one-year periods 1951, 1952, 1953 and 1954 as a result of the defalcations of Feldmeier, and in excess of $1,800 in each of the two one-year periods 1949 and 1950; that the total defalcations of Feldmeier exceeded $11,600; that demand for that amount was made upon the surety, which has refused to pay.

The surety in its answer admitted the issuance of the surety bond or policy dated June 29, 1940, the renewal agreements referred to in the complaint, the losses sustained by the plaintiff, the receipt of the proofs of its claim, and the refusal of the surety to pay the plaintiff the amount which it demanded. The surety alleged that, after receiving plaintiff's proofs of claim, the surety advised the plaintiff that under the terms and conditions of the contract the greatest amount to which plaintiff was entitled was $2,000; that the surety tendered a draft for that amount, which the plaintiff refused and still refuses to accept.

The problem was and is whether the contractual relation between the parties was such that the maximum liability of the defendant for all losses due to the dishonesty of Feldmeier during the years 1940 to 1955, the entire suretyship period, was limited to $2,000 or was the aggregate of the maximum amounts of coverage in each of the six years in which a loss, due to the dishonesty of Feldmeier, occurred.

The bond or policy contract entered into on June 29, 1940, appears to be on a form designated by the surety as "Continuous-Schedule." In the right-hand upper corner appears "Bond No. 39720." The first paragraph of the contract reads as follows:

"The Massachusetts Bonding and Insurance Company of Boston, Massachusetts, as Surety, in consideration of a premium computed at an agreed rate, hereby guarantees to pay to Julius Seidel Lumber Com-

pany, 2200 South Kingshighway, St. Louis, Mo., the Employer, such direct loss as the Employer shall sustain of money or other personal property belonging to the Employer, or for which the Employer is responsible, by any act or acts of Fraud, Dishonesty, Forgery, Theft, Larceny, Embezzlement, Wrongful Abstraction or Wilful Misapplication on the part of any Employee listed herein, directly or through connivance, while in any position in the service of the Employer, during the period commencing at 12 o'clock noon on the 15th day of July, 1940, and continuing until the termination of this suretyship."

That is followed by certain provisos and conditions, the first of which is:

"First: For any default within the terms of this bond by any bonded Employee, claim may be made while this bond is in force and within two years after termination thereof with respect to such Employee; but notice of such default shall be delivered to the Surety at its Home Office in the City of Boston, Massachusetts, within ten days after its discovery."

The second proviso reads:

"Second: On application, other Employees may be added hereto from time to time by the Surety issuing an Acceptance in writing showing the amount and effective date; and the Suretyship on any Employee may be increased or decreased by the Surety without impairing the continuity thereof, but the liability of the Surety under succeeding guarantees shall not be cumulative nor shall its aggregate liability on account of any Employee exceed the largest single amount set opposite any one position occupied by such Employee in any of such bonds; nor shall the suretyship granted for one period cover defaults occurring within any other period."

The fifth proviso reads as follows:

"Fifth: This Suretyship shall terminate:

"(a) As to any Employee upon his retirement from the service of the Employer or the discovery of loss on account of that Employee.

"(b) Upon thirty days' notice by the Surety to the Employer, and likewise the Employer may terminate any Suretyship hereunder by notice in writing to the Surety specifying the date of cancellation. Thereupon the Surety shall refund the unearned premium as to such cancelled suretyship, provided no claim has been paid thereunder.

"(c) By non-payment of agreed premium for a period of three months from effective date of this bond and renewal thereof."

The following is the last sentence of the sixth proviso:

"No one of the above conditions or provisions contained in this bond shall be deemed to have been waived or altered unless the waiver or alteration be in writing over the signature of an officer of the Surety, and no notice to any agent of the Surety or knowledge possessed by any such agent shall be held to effect a waiver or change in this contract or any part of it."

The "Schedule" attached to the bond listed three of the plaintiff's employees, including "L. A. Feldmeier; Position, Cashier and Bookkeeper; Amount $1800.00; Premium $10.00."

On the 11th day of July, 1941, the surety issued to the plaintiff a "Continuation Certificate Schedule"—"Schedule No. S35402; Renewal No. R–41; Agent's No. 39720"—continuing in force "Schedule Bond No. S35402 39720" in favor of the plaintiff

"on behalf of persons named in annexed schedule in the positions and for the sums therein specified for the period beginning the 15th day of July, 1941, and ending the 15th day

of July, 1942, subject to all the covenants and conditions set forth and expressed in said schedule bond heretofore issued on the 15th day of July, 1940.

"Provided the aggregate liability of Massachusetts Bonding and Insurance Company from the date of the issuance of said schedule bond to the date of the expiration of this certificate for or on account of any act or acts of any one of said persons shall not exceed the sum written opposite that person's name upon the attached schedule."

The schedule attached to the certificate contained the name of Feldmeier, cashier and bookkeeper, "Amount $1800.00, Premium $10.00."

On June 13, 1942, Bond No. 39720 was renewed for another year by the same form of continuation certificate, again scheduling Feldmeier for coverage in the amount of $1,800, for a premium of $10.00.

The surety on July 6, 1943—as a means of evidencing the continuation of its suretyship in force—in consideration of the annual premium, issued to the plaintiff a "Schedule Adjustment List" to be attached to "Schedule Bond No. S–35402 39720." This "Schedule Adjustment List" contained the following language:

"The current annual premium for the above bond is accepted upon the following terms and conditions: That this schedule supersedes all prior schedules or acceptances attached to the bond, and only those employees whose names and positions (if the bond is a name schedule) or positions only (if the bond is a position schedule) appear on this schedule are covered under the bond on and after the first day of the current premium year; that the coverage on each employee is continuous from its inception to its termination, and the coverage for separate periods shall not be cumulative; that if the coverage on any employee for separate periods be for different amounts, the maximum liability of the Company for all defaults of that employee shall be governed by the provisions of the bond, and shall in no event exceed the largest amount of coverage in force during any period within which defaults shall have occurred, nor shall the coverage for one period be available for defaults occurring within any other period.

"Attached to and forming a part of said bond * * *."

Feldmeier, cashier and bookkeeper, was scheduled for $1,800 coverage, at a premium of $10.00.

In 1944, a similar "Schedule Adjustment List" was issued by the surety to the plaintiff covering Feldmeier in the same amount and for the same premium as previously. For the three one-year periods from July 15, 1945, to July 15, 1948, continuation of coverage was evidenced by a like "Schedule Adjustment List." The premium paid to cover Feldmeier for the three one-year periods was $25.00. The amount of coverage for each year remained the same, namely $1,800. From July 15, 1948, to July 15, 1951, the means of evidencing that the suretyship or insurance continued in force was the same. The amount of coverage scheduled for Feldmeier after July 15, 1951, was increased to $2,000. The premium paid on his account was not increased. A "Schedule Adjustment List" continued the suretyship in force for the three one-year periods July 15, 1951, to July 15, 1954, for the same coverage and the same premium so far as Feldmeier was concerned. By a similar "List," coverage was extended on July 15, 1954, for three years. It thus appears that from the inception of the contract until the discovery of Feldmeier's defalcations, the annual premium charged for his coverage was $10.00, or less than that when paid in advance for a three-year period, and that the amount of his scheduled coverage never exceeded $2,000.

The position of the plaintiff is that, under the suretyship or insurance contract or contracts, the liability of the surety is cumulative and covers the aggregate of all losses which were sustained through the dishonesty of Feldmeier in each of the years from 1949 to 1954, inclusive. It is the position of the surety that, under the plain terms of its contract, its maximum liability for all losses attributable to the dishonesty of Feldmeier, regardless of when they occurred, is $2,000.

The question, as we see it, is whether, as a matter of Missouri law, the plaintiff had at all times one fidelity bond with the same noncumulative coverage or whether it had one such bond from July 15, 1940, to July 15, 1943, for $1,800 maximum coverage, and thereafter a separate contract for each of the years 1943 to 1954, inclusive, with cumulative coverage.

The plaintiff concedes that during the first three years of the suretyship the maximum aggregate amount for which the surety could have been held liable for defalcation by Feldmeier was $1,800. In its brief, referring to the contract of June 29, 1940, and the provision limiting aggregate liability in the first two Continuation Certificate Schedules, the plaintiff says:

" * * * Despite the confusing language of the original contract, the above provision expresses a clear intent to limit the surety's aggregate liability for all losses throughout the suretyship to the stated amount. However, this plain language limiting aggregate liability from the date of the original contract to the expiration of the year covered by the certificate was removed from appellant's forms in 1943 and it was omitted in all subsequent certificates issued to the appellee."

The plaintiff then contends that from 1943 on, the surety in each "Schedule Adjustment List" used language, as a means for evidencing the payment of premiums and the continuation of the suretyship, which failed to contain "a clear, express limitation against aggre-

gate liability," and was in fact "a retreat to ambiguity and obscurity" and a substitution of "confusing, ambiguous language for what had been a plain statement of the intended limit of its aggregate liability."

It seems apparent that the surety did not intentionally enlarge or change the coverage of its contract by substituting the form called "Schedule Adjustment List" for the form "Continuation Certificate Schedule" as a means of evidencing the continuation of its suretyship. There was no termination of the bond or policy, no change in annual premium, and only an insignificant change in the schedule coverage for losses attributable to Feldmeier. The question is whether, by changing the form used after 1943 to evidence continuation of coverage, the surety inadvertently subjected itself to cumulative liability for all losses to the limit of the specified schedule coverage for each of the years the suretyship was in effect.

Perhaps the classical statement of the rule applicable to the construction of contracts of insurance is that of Mr. Justice Sutherland in Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416. He said:

" * * * It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. Mutual Life Ins. Co. v. Hurni [Packing Co.], 263 U.S. 167, 174 [44 S.Ct. 90, 68 L.Ed. 235, 31 A.L.R. 102]; Stipcich v. [Metropolitan Life] Insurance Co., 277 U.S. 311, 322 [48 S.Ct. 512, 72 L.Ed. 895]. This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense. Imperial Fire Ins. Co. v. Coos County, 151 U.S. 452, 462–463 [14 S.Ct. 379, 38 L.Ed. 231]. * * *"

The Supreme Court of Missouri has stated the rule as follows:

" * * * The policy is a contract. Plain and unambiguous language must be given its plain meaning. The contract should be construed as a whole; but, in so far as open to different constructions, that most favorable to the insured must be adopted. State ex rel. Security Mutual Life Ins. Co. v. Allen, 305 Mo. 607, 614 et seq., 267 S.W. 379, 381, 382. However, as said in 14 R.C.L., § 103, p. 931, the rule 'does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists.' "

Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 101, 57 A.L.R. 615, 619; Aetna Life Insurance Company of Hartford, Connecticut v. Durwood, Mo., 278 S.W.2d 782, 786.

There are two cases decided by Missouri state courts which bear upon the question with which we are confronted. One is Grand Lodge of United Brothers, etc. v. Massachusetts Bonding & Insurance Co., 324 Mo. 938, 25 S.W.2d 783, 789 decided by the Supreme Court of Missouri in 1930. That was an action upon a fidelity bond for a one-year period commencing September 15, 1919, to cover losses sustained during the life of the bond and discovered within six months after its expiration or cancellation. The bond, by its terms, could be extended only by a continuation certificate executed by the surety. The surety twice renewed the bond by means of such certificates. It contended that each renewal was a separate contract and that, for that reason, losses which occurred during the first two years were not re-coverable because they had not been discovered within six months after the expiration of the original bond. The court was called upon to decide whether the continuation certificates or renewals constituted separate contracts or were merely the continuation of the original bond or contract. The certificates, among other things, provided:

"In consideration of the sum of Fifty and 00/100 Dollars Massachusetts Bonding and Insurance Company hereby continues in force Bond number F–86280 in the sum of twenty thousand dollars ($20,000) * * *."

In holding that the original bond and the two continuation certificates created but one bond for $20,000 covering a period of three years, and did not create three separate contracts the court said (at pages 788–789 of 25 S.W.2d):

"We recognize that it is generally held that a renewal of a bond or policy constitutes a separate and distinct contract for the period of time covered by the renewal. Eicks v. Fidelity & Casualty Co., 300 Mo. 279, 291, 253 S.W. 1029. However, this general rule has no application to a case where the provisions of the extension certificate show that the purpose and intention of the parties was not to make a new contract, but to continue the original contract in force and effect. The rule in this regard is thus stated in 25 C.J. 1109, § 16: 'The rule generally recognized is that a renewal of a policy or bond constitutes a separate and distinct contract, for the period of time covered by the renewal, unless it appears to be the intention of the parties, as evidenced by the provisions thereof, that such policy or bond and the renewal thereof shall constitute one continuous contract.' In other words, insurance is a matter of contract between the parties, and the provisions of the contract measure the rights and duties of the parties thereunder. * * *

* * * * * *

"  *   *   * The fact that the original bond was executed in the sum of $20,000, and the further fact that the two continuation certificates limit the total liability of the bonding company for the entire period covered by the original bond and the two continuances to $20,000, leads to the conclusion that the two continuances were not new bonds, but were in fact extensions of the term of the original bond.  We therefore hold that the original bond and the two continuances thereof were, in fact, but one bond in the sum of $20,000 covering a period of three years.  This being true, losses occurring at any time during the three-year period and discovered within six months after the expiration of said three-year period were within the terms of the bond, and appellant is liable therefor.  The evidence showed that the losses were discovered within six months after the expiration of the three-year period covered by the bond."

The plaintiff relies strongly upon the case of Krey Packing Co. v. Employers' Liability Assur. Corp., Limited, of London, England, Mo.App., 127 S.W.2d 780, decided by the St. Louis Court of Appeals in 1939, which ruled that a fidelity bond for a one-year term and a certificate continuing the bond for another year constituted two separate contracts and not a mere continuation of the original bond. The court in that case said (at page 782 of 127 S.W.2d):

"The rule generally recognized is that a renewal of a fidelity policy or bond constitutes a separate and distinct contract for the period of time covered by such renewal unless it appears to be the intention of the parties as evidenced by the provisions thereof that such policy or bond and the renewal thereof shall constitute one continuous contract. 25 C.J. 1109.

*   *   *   *   *   *

"We are concerned here with a bond expiring by its own terms at the end of one year succeeding its issuance, without any right of continuation, extension, or renewal whatever granted by its terms. With the ending of the year for which it was issued the bond by its own terms became of no force or effect whatever as a protection against subsequent losses.  It could be continued, extended, or renewed, only by agreement of the parties based on a new consideration.  The effect of the continuation certificate with respect to a continuation, extension, or renewal of the bond must therefor be determined solely from the language of the certificate.  If the aggregate liability of the defendant for the peculations of Vincent A. Gones occurring during the entire period of two years from the effective date of the bond to the date of the expiration of the certificate is to be limited to the sum of $1,000, such limitation must be found in clear and unambiguous terms within the four corners of the certificate."

After distinguishing to its own satisfaction the cases of Grand Lodge of United Brothers, etc. v. Massachusetts Bonding & Insurance Co., 324 Mo. 938, 25 S.W.2d 783, and United States Fidelity & Guaranty Co. v. Barber, 6 Cir., 70 F.2d 220, the court made the following statement (at page 783 of 127 S.W.2d):

"Rulings made in cases involving policies or bonds which contained stipulations for renewals and such provisions as one stating that the named amount of insurance or indemnity was to cover losses occurring during the continuance of the policy or bond or any renewal thereof, or one stating that the liability of the insurer should not be cumulative, or one stating that the liability should not be for more than a stated sum, whether the loss occurred during the term of the policy or bond, or a continuance thereof, or other similar provisions, are not applicable to the facts of the instant case."

The case of Globe Indemnity Co. v. Wolcott & Lincoln, Inc., 8 Cir., 152 F. 2d 545, is also referred to in the briefs, but is factually distinguishable. In that case the surety had issued two "Depositors Forgery Bonds," one covering losses sustained during the period June 6, 1940, to June 6, 1943, and having a "Superseded Suretyship Rider" attached. The other bond covered the period June 6, 1943, to June 6, 1946, and had attached to it another form of "Superseded Suretyship Rider." Losses in excess of $10,000 occurred during the period when each bond was in effect. The surety contended that the rider attached to the second bond in plain language limited the aggregate liability of the surety under both bonds to $10,000. The trial court held that the surety's liability under each bond was $10,000. This Court said (at page 548 of 152 F.2d):

"* * * The liability of the appellant under the first bond and its liability under the second bond were not cumulative liabilities, but were separate liabilities, for separate amounts, under separate contracts of insurance. Hence an agreement that these distinct liabilities should not be cumulative in amounts would be meaningless."

Our ruling, in effect, was that the trial judge had at least reached a permissible conclusion with respect to a doubtful question of Missouri insurance law.

In the instant case, the original bond creating this suretyship, as we read it, clearly provided that the liability of the surety should not be cumulative and should not exceed in the aggregate the largest single amount scheduled for an employee covered by the bond, and that the suretyship granted for one period should not cover another period. The suretyship was to continue until terminated in one of the following ways: (1) by the retirement from service of the employee or the discovery of loss on account of that employee; (2) upon thirty days' notice by the surety to the employer or by the employer to the surety; (3) by nonpayment of the agreed premium for a period of three months from the effective date of the bond and renewal thereof. Each of the Schedule Adjustment Lists issued after 1943, by its terms, became a part of the original bond. The following language of each of the "Lists" is, we think, inconsistent with an intention on the part of the surety to enlarge the maximum coverage of its original undertaking:

"The current annual premium for the above bond is accepted upon the following terms and conditions: * * * that the coverage on each employee is continuous from its inception to its termination, and the coverage for separate periods shall not be cumulative; that if the coverage on any employee for separate periods be for different amounts, the maximum liability of the Company for all defaults of that employee shall be governed by the provisions of the bond, and shall in no event exceed the largest amount of coverage in force during any period within which defaults shall have occurred, nor shall the coverage for one period be available for defaults occurring within any other period."

Had the original bond been for a definite, fixed period instead of "continuing until the termination of this suretyship," the Krey Packing Co. case (Mo.App., 127 S.W.2d 780) might be controlling. Cf. Great American Indemnity Co. v. State, Tex.Civ.App., 229 S.W.2d 850. In Columbia Hospital For Women, etc. v. United States Fidelity & Guaranty Co., 88 U.S.App.D.C. 251, 188 F.2d 654, at page 657, the court said:

"* * * It has generally been held that 'where the bond is for an indefinite term, the date it begins to run being the only date given, the fact that the premiums were paid annually does not make the relation a series of separate yearly contracts.' Brulatour v. Aetna Casualty & Surety Co., 2 Cir., 80 F. 2d 834, 836. Accordingly, even in the absence of a specific provision against cumulative liability, it has

been held that the continuous term of the bond impliedly excluded liability in excess of the amount stated in the bond, in spite of the extent of actual losses over the years."

See also: Bradley v. Fidelity & Casualty Co. of New York, 141 Pa.Super. 85, 14 A.2d 894; United States Fidelity & Guaranty Co. v. Barber, 6 Cir., 70 F.2d 220, 225, 226; Leonard v. Aetna Casualty & Surety Co., 4 Cir., 80 F.2d 205; Hack v. American Surety Co. of New York, 7 Cir., 96 F.2d 939, 945–946; New York Casualty Co. v. Ford, 5 Cir., 145 F. 2d 599, 602 and cases cited; Montgomery Ward & Co. v. Fidelity & Deposit Co., 7 Cir., 162 F.2d 264, 266–267. The cases on both sides of this question are collected in the Annotation to United States v. American Surety Co. of New York, 2 Cir., 172 F.2d 135, in 7 A.L.R. 2d 940, 946 et seq.

■ In a diversity case governed by state law, this Court will, as a rule, accept the considered views of the trial judge with respect to a doubtful question of the law of his state, unless the conclusion he has reached seems clearly untenable. See and compare, Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58, 62; Abbott v. Arkansas Utilities Co., 8 Cir., 165 F.2d 339, 340; Nelson v. Westland Oil Co., 8 Cir., 181 F.2d 371, 375.

■ While we cannot, of course, say with certainty that the applicable law of Missouri is not what the trial judge believed it to be, it seems to us so improbable that the Supreme Court of that state would—in view of its decision in Grand Lodge of United Brothers, etc. v. Massachusetts Bonding & Insurance Co., supra (324 Mo. 938, 25 S.W.2d 783), and of what we consider to be the weight of authority generally—hold, if called upon to decide this case, that the suretyship or insurance in suit constituted a series of separate and distinct contracts or obligations running from year to year from July 15, 1943, to July 15, 1955, with cumulative liability, that we have concluded that the judgment appealed from must be reversed and the District Court directed to enter judgment for the plaintiff for the $2,000 which the surety has tendered.

It is so ordered.