**Lee Dell YERINGTON, Appellant,**

v.

**Richard R. RISS, Sr., Respondent.**

No. 50059.

Supreme Court of Missouri,

Division No. 2.

Jan. 13, 1964.

Clyde J. Linde, Linde, Thomson, Van-Dyke, Fairchild & Langworthy, Kansas City, for appellant.

Lathrop, Righter, Gordon & Parker, Richard S. Righter, William M. Stapleton, Joseph E. Stevens, Jr., Kansas City, for respondent.

STOCKARD, Commissioner.

In this suit for fraud plaintiff sought $150,000 actual and $500,000 punitive dam-

ages. At the end of the plaintiff's evidence the trial court directed a verdict for defendant and plaintiff has appealed. We shall set forth the evidence in considerable detail.

In 1946 plaintiff purchased an army surplus B-7 bulldozer and went into the construction business. In 1952 he entered into a partnership arrangement with Mr. Emmett J. Breen, president of the Farmers Exchange Bank at Parkville, Missouri, and plaintiff borrowed money from that bank and from Mr. Breen with which to operate. In the early part of 1953 the business was incorporated under the name of Yerington Construction Company. (We shall hereafter refer to this corporation as "Yerington Company.") Of the 840 shares of common stock issued, 419 shares were issued to plaintiff, one share was issued to his wife, and 420 shares were issued to Mr. Breen.

Early in 1954 Mr. Breen indicated to plaintiff that he did not wish to continue to advance working capital to Yerington Company, and at Mr. Breen's suggestion plaintiff met defendant in Mr. Breen's office. As a result plaintiff entered into an arrangement with defendant to move some dirt on a project at Parkville. After the work was under way defendant stated that he would like to go into the construction business, that he had some dirt moving equipment of his own, that money was no object, that he had just bought thirteen million dollars of tractors and trailers (apparently for a trucking business), that he had five million dollars lying around, and that "we wouldn't have to borrow money" but he had "the money to operate on." According to plaintiff he and defendant came to an oral agreement the early or middle part of April. The terms of this agreement are not clear, but plaintiff testified that he told defendant that "we would have to have it on a fifty-fifty proposition," and that defendant agreed. In addition, according to plaintiff, defendant was to advance operating capital and money to buy equipment which was to be returned to him out of the earnings of the company. Plaintiff testified that all the money that would have been necessary for defendant to advance was thirty or forty thousand dollars, and that he expected defendant to loan the money without taking a note from the company. Under this oral agreement, according to plaintiff, defendant was to "match my equipment" with his equipment, and defendant's equipment was to be added to the assets of Yerington Company, but nothing was said about this equipment being sold to the company. Defendant also agreed to make the bid and performance bonds.

About two weeks after this oral agreement was reached, plaintiff figured a bid on a construction job at Olathe, Kansas, which amounted to more than $300,000.00, and which was much larger than plaintiff had been able to bid on before. Defendant furnished the bid bond and Yerington Company was awarded the contract which was executed as of April 27, 1954. Plaintiff testified that defendant also furnished the performance bond, but it appears from a copy of the contract that the performance bond was furnished by The Travelers Indemnity Company. On the day that plaintiff started to work for defendant he was told that he could use some of defendant's equipment, and after the oral agreement was entered into defendant told him "it is all one big family, go ahead and use" his equipment, and plaintiff did so on various jobs, including the Olathe job.

Defendant "was in on ordering all the equipment," and on behalf of Yerington Company he ordered a Bucyrus B-170 scraper at the cost of $16,000, but plaintiff signed the order, and other equipment at the cost of $58,000. Prior to this, Yerington Company had "turned in" some equipment to Victor L. Phillips Company and to Service Equipment Company and had credits of $13,000 and of $10,000. These two credits were used as part payment on this new equipment.

Plaintiff stated that pursuant to the agreement with defendant, Miss Kay McAuliffe was to be the bookkeeper of Yerington Company, and that he had no agreement to

go into business with her or with any person other than defendant. However, on May 21, 1954 plaintiff and Miss McAuliffe executed an agreement (dated May 20, 1954) the terms of which we shall set out in considerable detail. "In order to induce" Miss McAuliffe to enter into the agreement plaintiff warranted and represented certain matters and conditions pertaining to the corporate structure of Yerington Company and its financial condition. It was then provided that plaintiff "agrees to sell to [Miss McAuliffe] and [she] agrees to purchase from [plaintiff] five hundred sixty (560) shares of common stock of the Yerington Company * * * for the sum of Fifty-four Thousand ($54,000) dollars * * *," and that "at the time of the closing" plaintiff should (1) endorse in blank the certificates representing the 560 shares, (2) deliver to Miss McAuliffe the "minute book, stock certificate and transfer book, corporate seal, together with all books of account, agreements, documents and all other instruments of, or relating to the said Yerington Company," (3) deliver to Miss McAuliffe the "written resignation of each and every director and officer of said Yerington Company (other than [plaintiff]) which shall be expressed to be effective immediately," and (4) deliver to Miss McAuliffe "the call and waiver of notice of a special meeting of the Board of Directors to be held * * * at the time and place of the closing * * *." It was also provided that at the meeting of the Board of Directors "all of the directors shall be present in person, and at such meeting, shall, in due course, * * * accept the said resignations in rotation, and, upon the acceptance of each resignation of the Directors, other than [plaintiff], the remaining members of the Board of Directors of said Yerington Construction Company shall elect, in the place of the director whose resignation has been accepted, such person, as may be nominated by [Miss McAuliffe]." It was then provided that "the closing hereunder shall take place at the office of the Yerington Construction Company, or at such other place as the parties hereto may agree, on May 21, 1954 at 10:00 A.M.," and also that "at the consummation of the transfer of the aforesaid stock" plaintiff should "loan to the Yerington Construction Company, fifty four thousand ($54,000) Dollars to be evidenced by Corporate Note executed by the Yerington Construction Company for said amount payable in three annual installments, * * * said note to bear interest at the rate of five (5%) per cent per annum on the unpaid balance."

A special meeting of the board of directors of Yerington Company was held at 10:00 o'clock a. m. on May 21, 1954, and plaintiff presided as chairman. All the directors were present which, in addition to plaintiff, consisted of plaintiff's wife and Mr. Breen. Five stock certificates representing 420 shares of common stock in Yerington Company then issued in the name of E. J. Breen, and one certificate representing one share in the name of plaintiff's wife, were endorsed transferring said stock to plaintiff. This resulted in all the outstanding stock being in the name of plaintiff or indorsed to him. The minutes of the special meeting above referred to, which plaintiff and his wife approved and signed as chairman and secretary respectively, recite that plaintiff advised the board "that he sold 560 shares of the 840 shares * * * which he personally held and that it was his desire that Emmett J. Breen and Isabell Yerington [plaintiff's wife] resign as officers and Directors of this Corporation." The minutes then show that Mr. Breen resigned as director, and that the remaining two members, plaintiff and his wife, elected Miss Kay McAuliffe as director to fill the unexpired term. Plaintiff's wife then resigned as director and the remaining two, plaintiff and Miss McAuliffe, elected David H. Bresler as director for the unexpired term. Following this Mr. Bresler was elected vice president and Miss McAuliffe was elected secretary and treasurer.

Plaintiff testified that when this meeting of the directors started defendant stated,

with no prior notice to plaintiff, that he would not go along on "a fifty-fifty proposition" but that he was "going to have two-thirds of the stock" because he had made the bond at Olathe, he was going to be responsible for the new equipment, he was going "to put the money out" for operating expenses, and his "risk is just too great." Plaintiff testified that this demand occurred after the Olathe contract had been obtained and the new equipment had been purchased, and that if he had not acceded to defendant's demands "it would have ruined" Yerington Company. Plaintiff admitted that at the meeting the various acts referred to in the minutes did in fact occur, but he said that the minutes had been prepared in advance and that while he read them he did not understand them or know exactly what was being done.

At this meeting 560 shares of common stock of Yerington Company were issued to Kay McAuliffe which left 280 shares issued to plaintiff. No stock was issued in the name of defendant.

A second special meeting of the board of directors of Yerington Company was held at 3:00 o'clock in the afternoon of the same day in the office of Mr. Bresler, and all the then directors were present. These minutes, also signed and approved by each member of the board, which included plaintiff, recite that plaintiff "discussed in detail, plans for the future operations for the corporation and suggested that the company was in need of certain equipment that he was in position to purchase from the Transport Manufacture and Equipment Company [hereafter referred to as TM & E] and presented for consideration of the board a list of the equipment and machinery which he said could be purchased for $102,000.00 which amount the Seller agreed to accept in three annual payments of $34,000.00 each." TM & E was referred to by plaintiff in his testimony as "a company of Mr. Riss's," but was not otherwise identified. In an agreement, subsequently referred to, dated October 1, 1955 it is referred to as an Illinois corporation, and the agreement

was signed on its behalf by defendant, but his capacity is not stated. The above minutes for the meeting of the board of directors also recite that plaintiff "further stated that the corporation was in need of loans to liquidate various corporate debts and that he was willing to loan the corporation $54,000.00, said loan to be evidenced by an unsecured corporate note, payable in three annual payments of $18,000.00 each, said note to bear interest at the rate of 5% per annum." Two resolutions were then adopted authorizing the company to borrow the sum of $54,000 from plaintiff and to execute a note payable in three annual installments of $18,000 each, and to enter into an agreement with TM & E to purchase the equipment and machinery listed in a bill of sale dated May 21, 1954, and presented to the meeting. An additional resolution was also adopted wherein the officers of Yerington Company were "authorized, empowered and directed to borrow the sum of $101,563.00 from the Merchant's Bank of Kansas City, Missouri at the rate of 4½% interest, for a period of three years, and to execute as security for said loan a chattel mortgage on the personal property of the company, * *."

Plaintiff testified that it was at this second meeting of the directors that he signed the agreement between him and Kay McAuliffe, although it was at the first meeting that the various acts called for in the agreement pertaining to the transfer of stock and the changes in the directors were carried out. Plaintiff also testified that it was at this second meeting that a check in the amount of $54,000 was handed to him by Miss McAuliffe (apparently in payment of the stock issued to her) which he indorsed and handed back to her (apparently constituting the loan of that amount by plaintiff to Yerington Construction Company) and that she then handed him a promissory note executed by Yerington Construction Company in the amount of $54,000 which was dated May 21, 1954, and signed by plaintiff as president and Miss McAuliffe as secretary-treasurer.

On May 21, 1954 plaintiff and Miss Mc-Auliffe executed on behalf of Yerington Company an unsecured promissory note in the amount of $102,000 to TM & E. The same persons also executed a promissory note to the Merchants Bank of Kansas City in the amount of $101,563 secured by a chattel mortgage on property of Yerington Company. Plaintiff tesified that the $101,563 obtained from the Merchants Bank "went to pay some of the bills," and on May 24 he signed checks as president drawn on the account of Yerington Company as follows: $26,314.02 payable to Mr. Breen for a debt owed to him; $10,000 payable to Farmers Exchange Bank; $45,877.75 payable to Service Equipment Company for a scoop; and $1,446.92 payable to the C. B. & Q. Railroad.

The note for $102,000 payable to TM & E and the note for $54,000 payable to plaintiff contain the notation on each that on September 27, 1954 they were paid by the issue to TM & E of 1020 shares of preferred stock and to plaintiff of 540 shares of preferred stock. The Articles of Incorporation of Yerington Company show an amendment thereto on September 23, 1954 authorizing the issue of 2,000 shares of preferred stock at $100 par value in addition to the 1,000 shares of common stock previously authorized.

The minutes of a special meeting of the stockholders of Yerington Company, held April 27, 1955, recite that the stockholders present were Kay McAuliffe as holder of 60 shares and defendant as the holder of 500 shares "held by proxy from Kay McAuliffe," and that "a letter was received from [plaintiff] stating that he would not attend the stockholders meeting for the reason that it was improperly called and was therefore illegal." The meeting was called "for the purpose of electing directors, and particularly to fill the vacancy * * * created by the death of David H. Bresler." The directors elected were Kay McAuliffe, defendant and Emmett J. Breen. Attached to these minutes was a balance sheet revealing the financial condition of Yering-ton Company as of March 31, 1955, which showed an overdraft at the bank in the amount of $6,900.17 and deficits in earnings for the years of 1954 and 1955 of $91,847.62 and $79,932.63 respectively. A meeting of the directors of the corporation was held immediately following the stockholder's meeting, and the minutes thereof show that defendant was elected president, Howard Charles Breen was elected assistant to the president, Gordon Arnet was elected vice president, and Kay McAuliffe was elected secretary-treasurer. The minutes also recite that a discussion was had concerning the "present financial condition of the corporation," and that it was pointed out that there were "many unpaid bills, and additional financing would be necessary." The secretary-treasurer was then authorized to borrow "a sum of money not to exceed $25,000.00 upon such terms as may seem advisable."

▬▬▬ In addition to the $101,563 obtained from the Merchants Bank, Yerington Company borrowed from that bank $16,000 on June 23, 1954; $25,000 on May 13, 1955 (this apparently was the loan authorized at the meeting of the board of directors held on April 27, 1955); $70,521 on May 23, 1955; and $10,000 on June 2, 1955. Yerington Company also borrowed from the University Bank $16,000 on June 23, 1954; $50,000 on August 10, 1954; $75,000 on December 2, 1954; and $75,000 on May 16, 1955. These loans were arranged for by defendant. At the time of trial none of these notes were outstanding to the banks. However, on October 21, 1955, Yerington Company and TM & E entered into an agreement in which it was recited that TM & E was the holder of three promissory notes obtained from the Merchants Bank and the University Bank totaling $170,521 upon none of which had Yerington Company made any payments, and that in consideration of the cancellation by the holder of the notes of the entire indebtedness represented by those promissory notes Yerington Company sold, transferred and conveyed to TM & E all the property listed

in an exhibit, which included all of the assets of Yerington Company. In addition, Yerington Company assigned TM & E all its right, duties to perform, and interest, including all sums unpaid for work performed with respect to two sub-contracts, and in consideration therefor. TM & E agreed to perform the work called for in the two sub-contracts and "to indemnify and hold Yerington [Company] harmless from any and all claims which may hereafter arise out of the performance of work under such sub-contracts" by TM & E, and it "particularly" agreed to indemnify and hold Yerington Company harmless from any claims by the surety with respect to its contract bond applying to one of the sub-contracts. This agreement was signed by defendant on behalf of both Yerington Company and TM & E.

"The elements and essentials of an action for fraud are not in dispute. The rule is stated in 37 C.J.S. Fraud, § 3, p. 215 as follows: 'Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon.'" Lowther v. Hays, Mo., 225 S.W.2d 708, 713. In addition, a ninth element, as set out on page 216 of 37 C.J.S. supra, is the hearer's "consequent and proximate injury." Fraud is never presumed but must be established by evidence, Hardwicke v. Hamilton, 121 Mo. 465, 26 S.W.2d 342, and the burden of proof rests upon the one who asserts it. Lowther v. Hays, supra, 225 S.W.2d at p. 713. Proof of each element of fraud is essential to a submissible case, Meriwether v. Lumbard, Mo.App., 246 S.W.2d 363, and "Facts and circumstances which lead only to a suspicion of fraud or facts and circumstances as consistent with honesty and good faith as with fraud are insufficient to make out a case for the jury." Powers

v. Shore, Mo., 248 S.W.2d 1, 6; Schnuck v. Kriegshauser, Mo., 371 S.W.2d 242, 248. With these rules in mind we shall look to plaintiff's contentions.

In plaintiff's point in his brief he asserts only that the court erred in directing a verdict in favor of defendant and "in holding that plaintiff's evidence did not make a submissible case of concealment of existing facts and misrepresentations of the entire situation." We find no attempt there made to demonstrate what evidence established or authorized a finding of the various essential elements of fraud, particularly the false representation. From our understanding of plaintiff's argument, his contentions may be divided into three general groups. A. He first asserts that the evidence establishes that defendant and Kay McAuliffe "had a secret agreement between themselves whereby plaintiff would find himself in business not with [defendant] as contemplated, but with bookkeeper Kay McAuliffe who suddenly came into control of [plaintiff's] company." B. He next asserts that "In his talks with [defendant], plaintiff never agreed" (1) to sell stock of Yerington Company to Kay McAuliffe and accept $54,000 for two thirds of his shares of stock, nor to accept therefor the personal check of Miss McAuliffe and to indorse it back in exchange for an unsecured note of Yerington Company; or (2) "to buy the Riss machinery;" or (3) that "his company would borrow money from any bank;" or (4) "to go into business with Kay McAuliffe." C. He then asserts that defendant "concealed" the facts that (1) instead of defendant contributing machinery enough to match the value of machinery already put in by plaintiff, defendant was actually to sell his machinery to Yerington Company for $102,000; (2) that he had a secret agreement with Kay McAuliffe whereby she, and not defendant, was to get two thirds of Yerington Company stock; and (3) that instead of the working capital being put up by defendant it would be borrowed from the bank "and

secured by a chattel mortgage on Yerington's equipment."

■ Accepting plaintiff's evidence as true, which we do for the purposes of this appeal, and giving him the benefit of every reasonable inference to be drawn therefrom, the evidence establishes or authorizes a finding that in April 1954 plaintiff and defendant entered into an oral agreement that they would go into the construction business together, that defendant would add to the assets of Yerington Company machinery and equipment equal to that plaintiff had in the company, that Yerington Company would be operated by plaintiff, that defendant would advance operating capital and provide bid and performance bonds, and that defendant would receive one half of the common stock of Yerington Company. The evidence also authorizes a finding that plaintiff and defendant took certain steps to carry out that oral agreement, such as ordering new equipment and using defendant's machinery and equipment on Yerington Company jobs. Also, defendant supplied the bid bond for the bid on the Olathe contract. Thereafter, however, defendant refused to perform his oral agreement and demanded that he receive two thirds of the stock of Yerington Company, and as a result of defendant's refusal to perform the oral agreement, an entirely new arrangement was necessarily entered into and put into effect, as shown by the written agreement between plaintiff and Kay McAuliffe and the minutes of the two meetings of the board of directors held on May 21, 1954, whereby among other things, plaintiff sold two thirds of the common stock of Yerington Company to Kay McAuliffe for $54,000 which sum plaintiff then loaned to Yerington Company and received therefor an unsecured note, and whereby Yerington Company purchased certain machinery and equipment from TM & E for $102,000 and gave an unsecured note in payment therefor. The determinative question of this case is whether these facts and circumstances give rise to a cause of action for fraud in favor of plaintiff.

■ The general rule is that fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future. Bayer v. American Mut. Cas. Co., Mo., 359 S.W. 2d 748; Bryan v. Louisville & N. R. Co., 292 Mo. 535, 238 S.W. 484, 23 A.L.R. 537; Younger v. Hoge, 211 Mo. 444, 111 S.W. 20, 18 L.R.A.,N.S., 94; Reed v. Cooke, 331 Mo. 507, 55 S.W.2d 275; 23 Am.Jur. Fraud and Deceit § 35; Annotations, 51 A.L.R. 46 and 125 A.L.R. 879. Plaintiff relies primarily on Metropolitan Paving Co. v. Brown-Crummer Inv. Co., 309 Mo. 638, 274 S.W. 815, which held that "It is true that a promise to do a certain thing, with a present intention not to do it, is not actionable" as fraud, but added that "[a] false statement of a present purpose may be a misstatement of a fact" and that "Concealment of an existing fact may amount to actionable fraud, the same as an actionable misrepresentation of a fact." In that case, the defendant induced the plaintiff to assign to it a contract as a part of an agreement to purchase certain municipal bonds, when it concealed from the plaintiff that by reason of arrangements then in existence it was in fact purchasing the bonds for the other party to the contract and not for itself. We are not able to see how this case aids plaintiff. We find no evidence from which it reasonably can be inferred that defendant concealed, and thereby misrepresented, a present or pre-existing fact. Plaintiff was not induced to transfer the stock to defendant who had previously and secretly agreed to transfer it to Kay McAuliffe. Plaintiff transferred the stock directly to Kay McAuliffe pursuant to a written agreement he had entered into with her, and there is nothing to indicate that he did not know and understand exactly what he was doing. Defendant did not conceal from plaintiff the fact, and therefore misrepresent, that his machinery and equipment would be sold to Yerington Company. It may be true that he breached his oral agreement that he would transfer

machinery and equipment to Yerington Company upon the terms previously outlined, but after the breach of the agreement, plaintiff entered into a written agreement whereby he agreed that Yerington Company would purchase the machinery and equipment from TM & E and give a note in payment therefor, and plaintiff as president of Yerington Company signed that note. Again, there is nothing to indicate that he did not know and understand exactly what he was doing.

We have set out the evidence in this case to a much greater extent than we otherwise would have done to show the basis for our conclusion that the evidence authorizes a finding of no more than that defendant failed to carry out an oral agreement, and that as a result thereof plaintiff entered into other arrangements. This may have resulted in plaintiff having a cause of action for a breach of the oral agreement, but it did not result in a cause of action for fraud.

The "rule in this state is 'that fraud cannot be predicated upon a mere promise even though accompanied by a present intention not to perform it on the ground that even under such circumstances the promise is not a misrepresentation of an existing fact.'" Reed v. Cooke, supra, 55 S.W.2d at p. 278. In announcing this rule, this court en banc rejected a proposed opinion prepared in division to the effect that fraud could be predicated upon a promise made with the then intent not to perform it, and in doing so and in announcing the above rule it cited and quoted from Metropolitan Paving Co. v. Brown-Crummer Inv. Co., supra, the principal case relied on by plaintiff. We doubt that there was substantial evidence in this case from which it could be inferred that at the time defendant entered into the oral agreement he then had the intention of not performing it, and that may be the reason that plaintiff does not urge that the rule announced in Reed v. Cooke, supra, be re-examined. See 23 Am.Jur. Fraud and Deceit § 106, and the cases cited in the annotations at 51 A.L.R. 46 and 125 A.L.R. 879, where the rule is discussed.

Upon careful study of all the evidence in this case, and by applying thereto the rules above set forth, we necessarily conclude that the trial court properly directed a verdict for defendant.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.