Mary **MATTHEWS**,
Plaintiff-Respondent,

v.

The **FEDERAL LAND BANK OF ST. LOUIS, Federal Intermediate Credit Bank of St. Louis, and St. Louis Bank for Cooperatives, Defendants-Appellants.**

**No. 50636.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 21, 1986.

Robert W. Stewart, St. Louis, for defendants-appellants.

Kenneth V. Bryne, Clayton, for plaintiff-respondent.

KAROHL, Judge.

Defendants, the employer, appeal verdict and judgment for their former employee, Mary Matthews. The verdict and judgment in the trial court was in favor of Matthews in the sum of $50,000 actual and $50,000 punitive damages on her claim based on fraudulent misrepresentation which led to her dismissal.

Defendants jointly participated in operating the Farm Credit Banks of St. Louis (hereinafter "FCB"). FCB is a part of the Farm Credit System which is composed of a series of banks and associations which, while charted under Federal law, are owned by their borrower-members and operated on a cooperative basis. Their function is to serve the unique credit needs of farmers, ranchers, and aquatic producers and harvesters. Three separate types of institutions make up the system: (1) the Federal land banks and the local Federal land bank associations, (2) the Federal intermediate credit banks and the local credit associations, and (3) the banks for cooperatives. The Farm Credit Act of 1971, 12 U.S.C. § 2001, et seq., Pub. L. 92–181, December 10, 1971, 85 Stat. 583, is a complete legislative revision of the farm credit laws and the statutory basis for the farm credit system. A description of the background and history of the development of these banks may be found in the legislative history of the Farm Credit Act of 1971. H.R. No. 92–593, 92d Cong., 1st Sess. *reprinted in* 1971 U.S. Code Cong. & Ad. News 2091, 2096 et seq. Each defendant is a federally chartered instrumentality of the United States. The Farm Credit Administration is an independent agency in the executive branch of the government. The Farm Credit Administration supervises and regulates defendant banks. Jointly defendant banks operate a credit union for their employees. Plaintiff Matthews was the only employee of the credit union when discharged.

Mary Matthews began working for the Farm Credit Banks of St. Louis as a secretary-receptionist in 1978. Upon employment, she received a copy of the employee handbook from FCB. In February, 1980, Matthews was promoted to the position of credit union administrator, a position she held until the time of her discharge on September 30, 1982. She was responsible for maintaining all records, providing loan counseling, preparing loan applications, and performing all accounting and bookkeeping duties. She reported to defendants' office of personnel on an administrative basis and

to the Credit Union Board President, functionally. During the time that Matthews was credit union administrator, Virginia Perrin served as President of the Credit Union Board.

In May, 1982, Matthews requested a leave of absence to spend the summer at home with her son who was ill. Matthews asked Mr. Bowns, Vice-President of Personnel, if FCB would grant a leave of absence. Bowns affirmed that leaves were available and Matthews would need to apply through her supervisor. Matthews applied through Virginia Perrin, who discussed the request with Mr. Schaeffer in personnel. He was successful in finding a temporary replacement for Matthews and Perrin then presented the request to the Credit Union Board.

FCB granted Matthews a leave of absence effective June 1, 1982. She was to return either at the end of August or at the end of September. After the decision to grant the leave was made, but before it was accepted by Matthews, she asked Perrin if her benefits were protected while she was on leave. Perrin answered yes, however, Matthews was to use her accrued annual leave prior to beginning her leave of absence. This was a condition contained in the handbook. At trial, Perrin testified that she told Matthews to check with personnel for all other details of the leave of absence. Matthews testified that Perrin assured her that her seniority, benefits, and career were protected. Both Matthews and Perrin stated that the question of whether an employee can convert an unpaid leave of absence to sick leave with pay was neither asked nor answered.

While on leave of absence, prior to September 1, 1982, Matthews called Perrin to request an extension of leave from August 31, until September 30, 1982. After arranging for the continuation of a temporary replacement, FCB approved Matthew's extension. Subsequently, Matthews became ill and her doctor recommended gallbladder surgery. On September 10, 1982, she scheduled the surgery for September 28th and called FCB requesting that her accumulated sick leave of 406.06 hours be added onto her leave of absence in such part as necessary and effective October 1, 1982. Perrin and Schaeffer informed Matthews by phone that her leave could not be extended beyond September 30, 1982. FCB then notified her by letter of September 22, 1982, that her leave of absence would not be extended and requested her resignation. Matthews immediately replied by letter that she was requesting sick leave and not a further leave of absence. Her letter was not answered directly. FCB terminated Matthews by letter dated September 30, 1982, effective at 4:30 P.M. on September 30, 1982.

Matthews requested in a letter dated October 14, 1982, a meeting with Perrin and Schaeffer to clarify the situation; this meeting was held on October 29, 1982. At this meeting Matthews was told that an employee could not switch from unpaid leave of absence to sick leave with pay. In exchange for a general release, FCB offered Matthews a lump sum payment of her sick leave for which ordinarily she would be ineligible to receive under bank policy. Matthews refused the offer and filed suit. Matthews' petition contained three counts: (I) wrongful discharge under an employment contract; (II) violation of the service letter statute; and (III) fraudulent misrepresentation. Only Count III was submitted to the jury.

Employer contends four points on appeal: (1) plaintiff did not prove all the elements of fraudulent misrepresentation; (2) plaintiff has no cause of action sounding in tort because her discharge was under an employment contract; (3) defendants are not subject to punitive damages because they are instrumentalities of the federal government; and (4) plaintiff's proof of damages is limited by law to those sustained during the contract employment period. We affirm the award of actual damages and reverse the judgment of punitive damages.

Employers' first point on appeal alleges that Matthews failed to establish by sufficient evidence the elements necessary to submit and prevail upon a fraudulent mis-

representation theory under Missouri law. To prevail on this theory she was obliged to prove:

(1) a false, material representation;

(2) the speaker's knowledge of its falsity or his ignorance of its truth;

(3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated;

(4) the hearer's ignorance of falsity of the statement;

(5) the hearer's reliance on its truth and the right to rely thereon; and

(6) proximate injury.

*Huttegger v. Davis*, 599 S.W.2d 506, 511 (Mo. banc 1980). *See also, Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483, 488 (Mo. banc 1966).

Matthews pleaded in Count III, that defendants by and through their servants and employees stated and represented to her that a personal leave of absence: (1) protected her job, her employment and her career; (2) protected all of plaintiff's existing benefits, including seniority, retirement, pension, thrift plan, vacation and *sick leave;* and (3) protected plaintiff's right not to be discharged except for good cause. Matthews alleges that said statements were false and were known to be false or were recklessly made without any knowledge of their truth or falsity. She contends that the statements were made with the specific intent that she would act upon these statements concerning the personal leave of absence. Matthews alleges that she was ignorant of the truth or falsity of the representations. She alleges the right to rely on the statements and representations and in fact did so to her detriment.

In determining whether Matthews made a submissible case, we review the evidence that bears upon the elements of fraud in the light most favorable to the plaintiff giving her the benefit of all reasonable inferences which may be adduced from the transcript. *Ackmann*, 401 S.W.2d at 488. At trial, Matthews testified that upon requesting her leave of absence from Mrs. Perrin, she asked if her seniority, benefits

and career were protected. Mrs. Perrin replied in the affirmative. The only condition was the requirement to first exhaust her annual leave. At trial Perrin indicated that she was aware that Matthews wanted to return to the FCB and to continue her career. Prior to Matthews leave of absence, Mrs. Perrin was unaware of the contents of a supervisor's manual even though she was President of the Credit Union and Matthews reported to her. Mrs. Perrin was responsible for the decision to terminate Matthews. The supervisor's manual did provide that sick leave could not be used to extend a leave of absence. The Farm Credit Administration is charged with the responsibility of supervising defendants. The Farm Credit Administration requires that defendants utilize a district personnel policy manual and employee handbook. 12 C.F.R. § 612.2000 (1982). "Appropriate management and supervisory personnel *shall* be provided with a copy of the policy manual for guidance in managing human resources.... The policy manual(s) should address ... employee benefits." (emphasis ours) 12 C.F.R. § 612.-2020 (1982). Matthews testified at trial that she made her decision to take a personal leave of absence upon the representations made by Mrs. Perrin. She admitted she might have resigned if a leave of absence had been denied. However, she stated that she did not have to make the decision since she was granted the leave.

■ We find Matthews satisfied the six elements outlined in *Huttegger*. Perrin's statement regarding the benefits was a representation made in ignorance of its truth. The employee handbook was given to both Matthews and Perrin when they commenced their employment with the banks. In the handbook Section IV, entitled "Your Benefits", references to Section III which includes the subsection entitled "Time Off". This subsection includes a brief description of sick leave and leave of absence without pay. In regard to a leave of absence the handbook states that:

leaves without pay will be granted only in unusual circumstances, such as seri-

ous family illness,.... The maximum period ... is one year.... A leave without pay will not be granted to an employee until such time as all accrued vacation time has been used. Vacation time or sick leave will not accrue while employee is on leave without pay. *For further information about the treatment of other employee benefits, contact your supervisors or the Farm Credit Bank's Personnel Office.* (emphasis ours)

Sixth Farm Credit District, Employee Handbook, § 3.4.

Matthews contacted the vice-president of personnel for information about leave of absence who referred her to Mrs. Perrin, her supervisor. A review of the record in a light most favorable to the plaintiff indicates that Perrin told Matthews her seniority, *benefits* and career would be protected. The employee handbook is silent as to whether a leave of absence can be converted to or extended by sick leave. *Only* the supervisor's personnel handbook contains the limitation that "[while] granting leave without pay is not a common practice, an employee who is granted such leave may not later convert such leave to sick leave subsequently earned." At trial, Perrin stated that she had not read the supervisor's personnel handbook. Perrin had access to this directive but Matthews did not. On this evidence the jury could find Perrin's statement was made in ignorance of the personnel policy. The record supports a finding that Perrin represented that Matthews would sustain no diminution of benefits and that Matthews relied on this representation. Subsequently, Perrin was involved in the decision to terminate Matthews. This decision was made before Matthews was scheduled to return from her leave of absence and without advice that she could return before requesting sick leave. If Matthews had not been discharged by letter dated September 30, 1982, and effective on that day, plaintiff Matthews could have returned to work and then been eligible for sick leave. An interoffice communication indicated the decision to terminate Matthews was made by September 27, 1982. The discharge was pre-

mature and was evidence which the jury could consider in determining the issue of misrepresentation and Mrs. Perrin's knowledge of falsity. As a result of the representation made by Perrin at a time when she knew Matthews may rely on the statement, Perrin's admitted ignorance of the truth of her representation, plaintiff's reliance on the representation when she had no way to know and did not know of the falsity of the representation, and, discharge before the leave of absence expired, plaintiff sustained the loss of her employment.

FCB contends that Matthews' questions concerning benefits were not capable of being definitively answered with reference only to present facts and therefore were not an actionable false misrepresentation. We find that Matthews questions although relating to her future, demanded a determination based on present facts. FCB's reliance on *Yerington v. Riss*, 374 S.W.2d 52 (Mo.1964) is misplaced. In *Yerington*, the court stated "the general rule is that fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future". *Yerington*, 374 S.W.2d at 58. We find that Matthews inquiry and Perrin's representation was about existing benefits. Either Matthew's sick leave benefits were protected during an unpaid leave of absence or they were not. Perrin told her they were. The supervisor's handbook said they were not.

Permanent full time employee benefits according to the personnel handbook include sick leave. Although it may be contingent upon the employee's active status, Matthews was "actively" employed as defined in the employees' handbook because, when she began her leave she had worked in excess of a thousand hours in the 1982 calendar year. Nothing in the employee handbook gave the bank authority to deny her the sick leave prior to her termination. The only reference to sick leave in the employees' handbook reads, "Employees

*who* terminate *their* employment will not be paid for their accrued sick leave". (emphasis ours). FCB argues that because the employee was terminated, the benefit of sick leave is unavailable to plaintiff. Sick leave was contingent upon her continued employment. However, in the present case, Matthews requested her benefit, the sick leave; it was denied and then because of her absence due to illness she was terminated. There is no explanation for a tender by FCB to Matthews of a check for the accrued sick leave. The evidence satisfied the requirements of proof of the elements of misrepresentation set forth in *Huttegger v. Davis*, 599 S.W.2d at 511. Accordingly we deny defendant's claim that plaintiff failed to make a submissible case.

FCB's second point on appeal is that plaintiff's exclusive remedy is for breach of her employment contract. Appellants cite *Dake v. Tuell*, 687 S.W.2d 191 (Mo. banc 1985), in support of their contention that there is no cause of action in tort where the claim is based on misrepresentation of a term in a contract. *Dake v. Tuell* is inapplicable. In *Dake* the plaintiff was an at-will employee who could be discharged for cause or without cause and did not fall within the protective reach of a contrary statutory provision. *Dake* holds that only an at-will employee may not bring an action for wrongful discharge under the guise of a prima facie tort doctrine.

■ The basis of the holding in *Dake* is that prima facie tort cannot be used to substitute for a recognized tort. This does not hold that an existing contract action pre-empts an existing tort claim between employee and employer. Matthews was *not* an at-will employee. The employee handbook specified the limited conditions upon which an employee could be discharged. FCB was contractually bound by these terms.

We believe that, where as here, upon the hiring of an employee said employee is given a handbook containing policy statements of the employer and rules of employment there arises contractual rights in the employee without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and this despite the fact the statement of policy is not signed by the parties and could be unilaterally amended by the employer without notice to the employee, and contains no reference to any specific employee, his job description or compensation.

*Arie v. Intertherm Inc.*, 648 S.W.2d 142, 153 (Mo.App.1983). *See also, Gavan v. Madison Memorial Hospital*, 700 S.W.2d 124, 127 (Mo.App.1985).

FCB was under no obligation to establish these personnel policies or practices. It chose to do so and having made them known to its' employees the employment relationship was thereby enhanced. Defendant's witness Schaeffer read from the Supervisor's handbook FCB's personnel policy which states "unfortunately the separation of an employee is not always voluntary, an involuntary separation may be a disciplinary measure, the result of an inadequate performance, or for reasons of poor health." Mr. Schaeffer contended that Matthews was discharged as a result of inadequate performance. However, she was not notified of any such inadequacies. She was fired for not returning to work after the authorized leave of absence expired based on a decision made before the leave expired. No grounds for discharge existed when Matthews was terminated on September 30, 1982.

In Missouri, liability for a tort may arise out of a contractual relationship. *Helton v. Hake*, 564 S.W.2d 313, 317 (Mo.App. 1978). Plaintiff had the option to sue in tort or for breach of contract. *Morgan v. Wartenbee*, 569 S.W.2d 391, 397 (Mo.App. 1978). Plaintiff chose to submit the tort claim rather than the contract claim to the jury, as was her right. None of the cases cited by defendants relating to the prima facie tort and employees at-will are relevant because Matthews was *not* an at-will employee. She was entitled to elect her remedy under a recognized tort theory.

■ FCB's third point on appeal is that the defendants are not subject to punitive

damages because they are instrumentalities of the federal government. We agree.

The Sixth District Banks and Associations, the defendants, are part of the Farm Credit System. They are instrumentalities of the federal government. 12 U.S.C. §§ 2011, 2071, and 2122 (1982). Because they are instrumentalities of the United States the notes, debentures and other obligations issued are exempt from federal taxation. "Courts have recognized the 'pervasive involvement of the federal government in the creation and operation of the production credit associations' ". *In re Sparkman*, 703 F.2d 1097, 1101 (9th Cir.1983).

The Farm Credit System is supervised by the Farm Credit Administration, an independent federal agency. Farm Credit System policies are determined by the Federal Farm Credit Board, which consists of one member appointed by the President of the United States from each of the twelve districts and a thirteenth member who represents the Secretary of Agriculture.

[T]he United States, its agencies, and instrumentalities cannot be held liable for punitive damages unless there is express statutory authorization for such liability. *See* 28 U.S.C. §§ 2671, 2674; *Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921).

Congress set up production credit associations as part of the Farm Credit Act of 1933, modeling them on the farm loan associations established 17 years earlier. The 1933 Act expressly declared the production credit associations to be instrumentalities of the United States. 48 Stat. 267 (1933) (now codified as amended at 12 U.S.C. § 2098).

In 1971, Congress amended the Farm Credit Act of 1933. The amendments retained the language of the earlier provision, and added to another section of the 1933 Act the words: "Each production credit association ... shall continue as a federally chartered instrumentality of the United States." 85 Stat. 597 (1971) (codified at 12 U.S.C. § 2091). The

legislative history of the 1971 amendments explains that the 1933 language was "substantially retained to support the existing [production credit] associations as federal instrumentalities." House Rep. No. 92–593, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 2091, 2109. *"Neither the 1933 Act nor the amendments to the Act made production credit associations subject to liability for punitive damages."* (emphasis ours).

*In re Sparkman*, 703 F.2d 1097, 1101 (9th Cir.1983). *See also, Rohweder v. Aberdeen Production Credit Association*, 765 F.2d 109, 113 (8th Cir.1985). Both of these cases involved production credit associations. The defendants in this case are a land bank, a federal intermediate credit bank, and a bank for cooperatives. They are chartered under provisions similar to the charter for production credit associations. The Federal Intermediate Credit Bank provides funds for the local production credit associations and all of the banks are an integral part of the Federal Farm Credit System and the objective of the system is to satisfy the peculiar credit needs of American farmers and ranchers.

Congress has allowed the banks "to sue or be sued" 12 U.S.C. §§ 2012, 2033, 2072, 2122 (1982). However, "[t]he United States, its agencies and instrumentalities, cannot be held liable for punitive damages in the absence or express statutory authorization. *In re Sparkman*, 703 F.2d 1097, 1100 (9th Cir.1983). The PCA [Production Credit Association] is an instrumentality of the United States. 12 U.S.C. § 2091 (1982). *Rohweder* argues that the 'sue and be sued' clause in the enabling legislation for Production Credit Associations constitutes express authorization for punitive damage awards. This argument has been rejected by the 9th Circuit in *Sparkman*. *Id.* at 1101. Furthermore, *Rohweder* had not identified any case holding that a 'sue or be sued' clause authorizes punitive damages. Accordingly, we affirm the district court's decision to strike punitive damages." *Roh-*

*weder v. Aberdeen Production Credit Association,* 675 F.2d 109, 113 (8th Cir.1985).

We find the decisions in *Sparkman* and *Rohweder* decisive on the issue of the availability of punitive damages in the present case. Punitive damages are not authorized and the judgment for punitive damages is reversed.

■ FCB's final point is that Matthew's proof of damages is limited by law to those sustained during the contract employment period. FCB contends that if Matthews was defrauded, she is only entitled to the difference between the actual value of the property [her job defined by the employment contract] and what its value would have been if it had been as represented. Defendant's rely on the "benefit of the bargain rule." *See, Smith v. Tracy,* 372 S.W.2d 925, 938 (Mo.1963). FCB contends that Matthews had a contract for a period of one year that was renewed annually and therefore damages should be measured only by the wages lost between the time of her scheduled return from her leave of absence to the time remaining in her 1982 one year contract. We reject this contention for two reasons. First, as already decided, plaintiff was not limited to a remedy for breach of the employment contract and this measure of damages is appropriate to a contract claim. Second, this contention is not supported by the evidence. Plaintiff was a permanent employee as defined in the employee handbook. There was no fixed termination date or set employment period on the expiration of which employment automatically terminated. A permanent employee was expected to give two weeks notice of an intention to voluntarily terminate employment. Involuntary termination was authorized for failure to perform satisfactorily, violation of work rules, or conduct detrimental to the Banks and Associations or their operations. The banks agreed, whenever possible, to inform the employee of deficiency and continued misconduct or failure to correct performance deficiency would result in discharge. After receiving notice the employee was to have adequate time and assistance in which to improve. These are terms of employment as set forth in the employee handbook. Plaintiff testified that her agreement was renewed each year but she also testified that her employment continued "unless ... dismissed for good reason." Defendant's witness Gene Schaeffer, Assistant Vice-President for Personnel, provided Matthews with a letter dated September 20, 1982. In that letter he declined Matthews request to use sick leave after September 30, 1982, and said, "We value you as an employee and for the hard work you put into supporting the credit union." He also requested Matthews' resignation and enclosed a form for that purpose. Schaeffer testified for defendants and recognized the limitation set forth in the employee's handbook for discharge for cause and the provisions for warning on deficiency and allowance of time to cure. The discharge in the present case was not for cause but for failure to return to work on the expiration of the leave of absence. The employment was an indefinite period under the terms of the employee agreement and not for a one year period. There is no evidence from which the jury could find that plaintiff would have been terminated under the employment agreement at any fixed future date. The jury awarded damages for loss of employment and not as compensation for unpaid wages. We find appellants final point without merit.

The judgment for actual damages is affirmed the judgment for punitive damages is reversed.

PUDLOWSKI, P.J., and CRANDALL, J., concur.