[No. C000003. Third Dist. Jan 20, 1988.]

WOODLAND PRODUCTION CREDIT ASSOCIATION, Plaintiff and Appellant, v.
NICOLI G. NICHOLAS et al., Defendants and Appellants.

[**Opinion certified for partial publication.**\*]

---

\* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portions to be published follow.

**COUNSEL**

Hefner, Stark & Marois, William Gallagher and Ray C. Thompson for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton and James J. Carroll as Amici Curiae on behalf of Plaintiff and Appellant.

Weintraub, Genshlea, Hardy, Erich & Brown, L. Bunda Gilbert and Joseph I. Genshlea for Defendant and Appellant.

**OPINION**

**CARR, J.**—The instant appeal and cross-appeal arise from a dispute between plaintiff Woodland Production Credit Association (WPCA) and defendants Nicoli and Barbara Nicholas (defendants). After loaning defendants money for their cattle ranching business, WPCA foreclosed on the loan, took possession of and sold the cattle and sued for a deficiency judgment of more than $261,000. Defendants cross-complained on a variety of theories set out in detail in a later portion of this opinion.

After a four and one-half month trial, the jury returned verdicts in favor of defendants on both the complaint and cross-complaint, finding WPCA (1) breached its contract, (2) was estopped to deny the contract, and (3) negligently and intentionally interfered with defendants' prospective business advantage. The jury awarded $1,015,000 in compensatory damages

and $500,000 in punitive damages. The trial court struck the punitive damages and, after taxing costs, awarded defendants attorney's fees.

WPCA appeals, contending (1) the judgment for breach of contract must be reversed because of numerous violations of basic principles of contract law; (2) the jury's verdict finding estoppel must be reversed as no such independent cause of action exists; (3) there is insufficient evidence to support the jury's verdicts for either negligent or intentional interference with prospective business advantage and, in any event, the verdicts are inconsistent; (4) defendants recovered twice for the same injuries; (5) improper expert testimony was permitted; (6) evidence was erroneously admitted; and (7) the jury was incorrectly instructed. In their cross-appeal, defendants contend the trial court erred (1) in striking the punitive damage award and (2) in determining the amount of defendants' attorney's fees. Only the last contention has merit; in all other respects we shall affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in a light most favorable to the jury's verdicts, the evidence at trial disclosed the following: Defendants owned and bred Charolais cattle, which were kept on the Verona Ranch, property held in trust as part of the estate of defendants' father. In 1973, defendants decided to expand their breeding operation by purchasing additional cattle and acquiring other range land.

WPCA is a production credit association chartered under the Farm Credit Act of 1933 (12 U.S.C. § 2001 et seq.). All production credit associations are federally chartered corporations and are instrumentalities of the United States. (12 U.S.C. § 2091.) They are governed by the Federal Intermediate Credit Banks which in turn are under the jurisdiction of the Federal Farm Credit Administration, an independent unit of the executive branch of government. (12 U.S.C. § 2241.) Production credit associations were created during the great depression for the purpose of providing credit to farmers and ranchers.

Through its loan officer, B. Wilson, WPCA solicited defendants' business, asking them to terminate their relationship with Bank of America and to finance the expansion program through WPCA. After extensive negotiations, defendants completed a loan application with WPCA and Wilson prepared a "loan action," describing the loan in further detail. After reviewing these documents, as well as inspection reports and budgets, the WPCA loan committee approved defendants' request.

In October 1973, WPCA sent defendants a packet of documents, including a loan closing letter informing them their "range livestock loan" had

been approved. Also included were a loan agreement, security agreement, and promissory note for over $691,000. The loan essentially operated as a line of credit, with funds available for defendants to draw upon as needed for budgeted items. The note indicated it was payable on demand or in one year. Defendants asked Wilson about the term of the note as they had previously explained to WPCA that the expansion program would take five to seven years to complete. Wilson assured them the note was just a form and that the balance remaining at the end of the year would simply be incorporated into a new note. Defendants signed the loan papers.

Over the course of the year, defendants drew on their loan to lease range land for a five-year period and buy cattle. WPCA disbursed funds for these purchases without any problems.

In the late spring of 1974, the local Federal Intermediate Credit Bank (FICB) conducted its annual review of WPCA. FICB was concerned with WPCA's "weak" credit administration, and the deteriorated credit quality of its livestock loans. FICB notified WPCA that it would conduct a special interim credit review to assess this situation in six months.

Late in 1974, defendants renewed and increased their loan with WPCA to slightly over $1 million, after the loan committee reviewed a proposed budget and loan action.

Soon afterwards, FICB conducted its interim credit review and gave WPCA a very critical appraisal. FICB recommended WPCA strengthen its loan collection efforts and placed WPCA on "special prior approval" status, thereby requiring all livestock loans to be approved by FICB before WPCA acted upon them. By the time of its annual credit review in mid-1975, WPCA's situation had declined further.

During this period of time, cattle prices had fallen. WPCA devalued defendants' herd, assessing their worth at commercial rates, rather than that for registered breeding cattle. This periodic devaluation continued even after prices began to rise again.

In June 1975, Loan Officer Wilson was replaced by James Vierra, who told defendants to "pare down" their operations and accelerate sales.

In January 1976, defendants applied for a renewal of their loan. WPCA did not process the application until February 1976, when Vierra prepared a loan action, proposing additional conditions for the loan, and a loan summary. In March 1976, WPCA imposed conditions to continue month-to-month funding. WPCA refused to provide funding for additional livestock

purchases and ordered defendants to return all of their cattle to the Verona Ranch by May 15. A small loan of approximately $15,000 was approved in May 1976, but was never disbursed. In May 1976, defendants met with Charles Rayl (the WPCA manager) and Vierra. Rayl told them their loan could no longer be viewed as well-secured and spoke to defendants about improving their position. Rayl also said that if defendants did not bring all of the cattle back to the Verona Ranch, he would "pull the plug" on defendants and force them out of business. If the cattle were not removed from the leased property by June 1, when a $50,000 pasture payment was due, the property owners would have an agister's lien on the herd located there.

In June 1976, WPCA finally approved a loan for $29,500, the first funding defendants had received in eight months.

In December 1976, FICB presented its annual credit review of WPCA, in which it gave WPCA its lowest possible rating. In mid-December, WPCA's Board of Directors voted to discontinue defendants' financing and required the herd be liquidated by June 1, 1977. Defendants began to sell their cattle, although the market was poor during this period of time due to drought; prices were expected to improve in the fall.

WPCA repossessed the remaining 761 cattle and sold them at a public auction as ordinary, nonregistered cattle and received $148,898.04, leaving a deficiency judgment of over $260,000, which WPCA sued to collect.

In response, defendants asserted WPCA failed to act in good faith or in a commercially reasonable manner in liquidating the loan. They cross-complained, asserting WPCA had breached its agreement to finance their expansion program over a five- to seven-year period. The cross-complaint also alleged (1) WPCA was a joint venturer in the expansion program, (2) the contract was unenforceable as an adhesion contract, (3) WPCA was estopped to deny the terms of their agreement, and (4) WPCA intentionally and negligently interfered with defendants' prospective business advantage.

Additional testimony given at trial is incorporated where relevant, infra. After a lengthy trial, the jury returned verdicts in favor of defendants on both WPCA's complaint and the cross-complaint, finding WPCA breached its contract, was estopped to deny the terms of the contract, and negligently and intentionally interfered with defendants' prospective business advantage.[1]

---

[1] The jury returned verdicts for WPCA on defendants' causes of action alleging a joint venture and an adhesion contract. It returned verdicts for defendants in the following amounts: (1) breach of contract, $750,000; (2) intentional interference with prospective business advan-

In response to WPCA's motion for judgment notwithstanding the verdict, the trial court struck the punitive damages award, finding WPCA a "federal instrumentality" and thereby immune from liability for punitive damages. The court denied WPCA's motion for new trial.

Defendants submitted their costs bill, which included some $272,000 in attorney's fees pursuant to Civil Code section 1717. WPCA moved to tax costs. The court found defendants entitled to reasonable attorney's fees for defending the complaint and prosecuting the contractual issues raised in the cross-complaint, arriving at an aggregate compensable amount of $70,000. These appeals followed.

## DISCUSSION

## I-VII*

. . . . . . . . . . . . . . . . . . . .

*Defendants' Cross-appeal*

In their cross-appeal, defendants contend the trial court erred in (1) finding WPCA immune from punitive damages and (2) awarding defendants only $70,000 of their claimed attorney's fees of nearly $273,000. We address each contention in turn.

### I

■ After the jury returned its verdicts in favor of defendants and awarded $500,000 in punitive damages, WPCA moved for judgment notwithstanding the verdict, based in part on its earlier contention that a production credit association (PCA) is immune from liability for punitive damages. The trial court agreed and struck the jury's award.

The statutory framework governing PCA's is the Farm Credit Act (the Act) (12 U.S.C. § 2001 et seq.). This legislation declared it "to be the policy of the Congress, recognizing that a prosperous, productive agriculture is essential to a free nation and recognizing the growing need for credit in

---

tage, $250,000 in compensatory damages and $500,000 in punitive damages; and (3) negligent interference with prospective business advantage, $15,000 in compensatory damages. No damages were sought or awarded in connection with the estoppel finding.

*See footnote, *ante,* page 123.

rural areas, that the farmer-owned cooperative Farm Credit System be designed to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations." (12 U.S.C. § 2001(a).)

The Act provides, "Each production credit association chartered under section 20 of the Farm Credit Act of 1933, as amended, shall continue as a *federally chartered instrumentality* of the United States." (Italics added, § 2091; see also 12 C.F.R. ch. VI, § 611.400(a) (1987).) PCA's are granted certain enumerated powers, including the power to sue and be sued. (12 U.S.C. § 2093(4).)

Defendants contend that since PCA's are not immune from suit, they are likewise not immune from punitive damages, an argument we find contrary to established law.

Neither the federal government nor its instrumentalities may be held liable for punitive damages unless there is an express statutory authorization for such an award. (*Matter of Sparkman* (9th Cir. 1983) 703 F.2d. 1097, 1100-1101; see *Missouri Pacific R. Co.* v. *Ault* (1921) 256 U.S. 554, 563-565 [65 L.Ed. 1087, 1092-1093, 41 S.Ct. 593]; *Painter* v. *Tennessee Valley Authority* (5th Cir. 1973) 476 F.2d 943, 944.) PCA's were initially chartered as federal instrumentalities and continue as such even though the initial funding provided by the government was repaid in 1968. (*Smith* v. *Russellville Production Credit Ass'n* (11th Cir. 1985) 777 F.2d. 1544, 1550.) The Act does not contain an authorization for liability for punitive damages.

The precise question presented in this cross-appeal has been resolved contrary to defendants by no fewer than six courts. In *Matter of Sparkman, supra,* 703 F.2d 1097, the Ninth Circuit Court of Appeals held "[a] federal instrumentality . . . retains its immunity from punitive damages unless Congress *explicitly* authorizes liability for such damages. . . . [W]hile the 'sue and be sued' clause in the enabling legislation for production credit associations waives sovereign immunity from ordinary lawsuits, it does not subject production credit associations to liability for punitive damages. Such immunity must be expressly waived." (*Id.,* at p. 1101.) The court noted that although PCA's possess many of the characteristics of private

institutions, they remain federal instrumentalities in which the federal government exercises its involvement. (*Ibid.*)[13]

An identical conclusion was reached by the Eighth Circuit Court of Appeals in *Rohweder* v. *Aberdeen Production Credit Ass'n* (8th Cir. 1985) 765 F.2d 109, 113, and the Eleventh Circuit in *Smith* v. *Russellville Production Credit Ass'n, supra,* 777 F.2d at pp. 1549-1550.) In *Smith,* the court noted, "Although punitive damage awards against PCAs would not be paid out of the federal treasury, such awards would interfere with public administration. PCAs fulfill a government mission of channeling credit primarily to farmers. [Citation.] Punitive damages would have to be paid from money that could otherwise be targeted to financing tractor equipment purchases, land expansion, or supply needs. The government's purposes in establishing the PCAs would thus be undercut." (*Id.,* at p. 1550.)

Similarly, the three state courts that have considered this question have all concluded PCA's, as federal instrumentalities, are immune from liability for punitive damages. (*Kalwitz* v. *La Porte Prod. Credit Ass'n* (Ind.App. 1987) 508 N.E.2d 819, 822-823; *Taylor Ent.* v. *Clarinda Prod. Credit Ass'n* (Iowa 1987) 403 N.W.2d 794, 796-797; *Matthews* v. *Federal Land Bank of St. Louis* (Mo.App. 1986) 718 S.W.2d 220, 225-227.)

We find these authorities persuasive. PCA's are federal instrumentalities immune from liability for punitive damages absent an express authorization to the contrary. Because no such authorization exists, the trial court properly struck the jury's award of punitive damages.

II*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The matter is remanded to the trial court for a redetermination of the attorney's fees to be awarded to defendants. In all other respects, the judg-

---

[13] At oral argument, defendants in vigorous words urged this court to reject the holding of *Sparkman* as "wrong." We decline the challenge. If a legislatively designated "federally chartered instrumentality of the United States" is to become liable for punitive damages, we deem it the prerogative of the United States Congress to so declare.

* See footnote, *ante,* page 123.

ment is affirmed, defendants Nicoli and Barbara Nicholas to recover costs on the appeal and cross-appeal.

Puglia, P. J., and Sparks, J., concurred.